## *In re* KELLY.

*(Circuit Court, D. Oregon. November 10, 1890.)*

1. DESIGNATION OF CRIME IN COMMITMENT.
   It is a sufficient designation in a commitment of the crime of inveigling a person, with the intent to cause him to be sent out of the state against his will, if it states that the party has been held to answer for "the crime of enticing and inveigling Alfred Armstrong and William Kelly to leave the state of Oregon against their will;" for from this statement it must be implied that the inveiglement was "with the intent" that they should so leave the state.

2. INVEIGLEMENT WITH INTENT TO CAUSE ONE TO BE SENT OUT OF THE STATE.
   To inveigle another by false and fraudulent representations, or otherwise, with intent that such other should be thereby induced to leave the state of his apparent free will, is equivalent to causing him to be sent out of the state against his will, contrary to section 1746 of the Laws of Oregon, (Compilation 1887.)

**8. PLACE OF THE COMMISSION OF CRIME.**

The crime defined by section 1746 (Comp. 1887) of the Laws of Oregon is completely committed whenever, by false and fraudulent representations, or other means adequate to that end, the person inveigled is caused or induced to surrender himself to the guidance or control of those whom the party guilty of the inveiglement purposed and expected to take him, or cause him to be taken, out of the state; and a prosecution therefor cannot be maintained in any other county than the one in which such inveiglement took place.

**4. DUE PROCESS OF LAW.**

A commitment by a justice of the peace for a crime not committed in his county is void for want of jurisdiction, and the party held thereunder is deprived of his liberty without due process of law, contrary to the fourteenth amendment.

*(Syllabus by the Court.)*

On *Habeas Corpus.*

*Mr. Franklin P. Mays, Mr. Edward N. Deady,* and *Mr. Charles E. Lockwood,* for petitioner.

*Mr. Henry E. McGinn* and *Mr. Paul R. Deady,* for respondent.

DEADY, J. On the petition of Joseph Kelly, filed in this court October 30, 1890, a writ of *habeas corpus* was allowed by me, returnable to this court, directed to H. A. Smith, sheriff of Clatsop county, commanding him to produce the body of said Kelly, alleged by him to be unlawfully detained, together with the cause of detention. On November 3d the sheriff produced the body, and made return that he held the petitioner in custody in pursuance of a commitment issued by A. A. Cleveland, a justice of the peace for the precinct of Astoria, in Clatsop county, Or., dated October 30, 1890. The commitment, after stating the venue, Astoria, Clatsop county, and entitling the cause, continues as follows:

"*In the Name of the State of Oregon, to the Sheriff of the County aforesaid:* An order having been made this day by me that Joseph Kelly, who has been duly held to answer before the grand jury for the crime of enticing and inveigling Alfred Armstrong and William Kelly to leave the state of Oregon against their will, be confined in the county jail to await the action of the grand jury of Clatsop county, Oregon, you are hereby commanded to receive him into your custody, and detain him accordingly, or until he be otherwise legally discharged.

"A. A. CLEVELAND, Justice of the Peace for Astoria Precinct.
"*Dated this* 30*th day of October, A. D.* 1890."

In the corner are the words: "Bail fixed in the sum of $1,000 in each case."

To this return there was a demurrer filed, on the ground that the commitment did not sufficiently designate any crime known to the law. By consent of counsel, evidence was also offered by the petitioner and respondent on the question of whether, as a matter of fact, any crime had been committed by the petitioner, as alleged, in Clatsop county; and if on the argument the court should be of the opinion that the commitment is sufficient, and overrule the demurrer, the matter should then be considered on the question whether any crime had been committed by the petitioner over which the justice issuing the commitment had jurisdiction.

The crime on which it is claimed the petitioner stands committed is defined by the law of this state in section 1746 of the compilation of 1887. It reads:

"Every person who, without lawful authority, forcibly seizes and confines another, or inveigles or kidnaps another, with intent either (1) to cause such other person to be secretly confined or imprisoned in this state against his will; or (2) to cause such other person to be sent out of this state against his will,—shall be punished by imprisonment in the state penitentiary not less than one nor more than ten years."

It is evident that the crime for which this commitment is intended, and for which it is attempted, at least, to commit the petitioner, is the one referred to in the second subdivision of the section: "To cause such other person to be sent out of this state against his will."

Section 1610 of the compilation of 1887 prescribes the form of the commitment by a magistrate, which may be substantially in the following form:

"*In the Name of the State of Oregon, to the Sheriff of the County of* ———, greeting: An order having been this day made by me that A. B. be held to answer upon a charge, [designating it generally,] you are therefore commanded to receive him in your custody, and detain him until legally discharged." Dated and signed.

To inveigle a person, as it is claimed in this case the petitioner did these parties, Armstrong and Kelly, is to seduce them, to entice them, not by force, but by some art, some device, some representation which is essentially false, and calculated to secure action on the part of the person sought to be inveigled; to secure his acquiescence in the purpose of the mover, so that he may become within the control of some person or persons, with intent that he be sent out of the state; and the device, the art, the seduction, the inveiglement, must be, I suppose, adequate to that end. It is not necessary that force be used. Using force is a distinct case, and, where no force is necessary to be used, the party goes apparently with his will, but on a false impression of where or why he is so going. It stands to reason that the party who acts upon a false representation, upon a device or trick, which misleads him, though apparently acting with his own free will, is, within the meaning of this statute, acting against his will; and if he so goes out of the state, or is sent out of the state in pursuance of that inveiglement, he is sent out of it, within the meaning of this statute.

The crime is to be designated generally, according to the statute, in the commitment. A crime that has a general or generic name is a simple thing to describe,—as murder, arson, burglary, larceny; but a crime that consists of several particulars, and has no generic name, and is described in the statute, must necessarily (although it may be designated generally) be designated with more particularity than a crime like murder, arson, or burglary. This is a crime that consists of two particulars, —the inveigling, and the intent that the party should thereby be sent out of the state. The justice says in the commitment that the petitioner has been held to answer "for the crime of enticing and enveigling Al-

fred Armstrong and William Kelly to leave the state of Oregon against their will." If it had been said in the commitment, "with intent to send them out of the state against their will," it would have followed the language of the statute, and no question as to the sufficiency could be made.

Courts are not required, nor justified, I think, in applying the nice rules of construction to a commitment by a justice of the peace that they may and often do necessarily in the consideration of indictments by grand juries. My own opinion is, although I had an impression to the contrary when I first heard the commitment read, that it is sufficient; that, if the petitioner enticed and inveigled the men to leave the state against their will, he did so with intent that they should so depart. He could not have done so without such intent. The intent must have accompanied the act. It is necessarily implied in the statement that "he enticed and inveigled them to leave the state against their will," and what is necessarily implied in the language used must, I think, be considered as expressed. The commitment is, I think, upon reflection and examination, sufficient.

The section defining this crime is taken from section 272, Pen. Code N. Y. 1864, where it was substantially compiled from 2 Rev. St. p. 664, § 30. In *Hadden* v. *People*, 25 N. Y. 372, it was held, under the revised statutes, that procuring the intoxication of a sailor, and getting him on shipboard in that condition, with the intent and expectation that the sailor would be thus carried out of the state, is a violation of the statute, even though in fact the ship be not destined to leave the state. If the party charged with the commission of the crime believes that the ship is going out of the state, and inveigles the sailor on board with the expectation and purpose that he shall go out of the state on the ship, he has committed the crime; and, although the ship does not go out of the state, even though it does not intend to go out of the state, it does not excuse him. His crime is committed when the party is enveigled on board the ship with the intent on his part that he should thereby be taken or got out of the state without his free will.

The evidence in this case is somewhat meager. The men, Armstrong and Kelly, were examined, as were also the petitioner, Mr. Byrnes, the harbor master, the expressman who took their baggage to the steam-boat on Saturday, the 25th, when they left here. They were not examined very thoroughly, and the testimony on some points is obscure. The material facts appear to be about these: Kelly, the petitioner, is employed, apparently, in the business of procuring sailors for ships leaving this port. He had been employed to procure a crew for the English ship Noddleburn. It seems that a day or two before the Saturday on which they went below, the petitioner had procured five seamen, and they had been shipped here, as I suppose, by signing articles before the British consul. Able-bodied seamen were to have $30 a month.

It was probably on Friday, a short time before Saturday, the 25th of October, that the master spoke to the petitioner about the men, and he said two of them were gone; one of them was in jail. The master re-

plied that he must get two more in their places, whereupon he immediately went to the employment office of Mr. Witherill, and asked him to put on his bulletin board a notice that two sailors were wanted. He did so, and very soon one of these men, Kelly, I think, came in and said he wanted a place, and soon after the petitioner was taken to where Armstrong was; at least, he met them both through this notice. Kelly and Armstrong say the petitioner told them they would be shipped in place of two men who did not respond, and that they would get $30 a month. Kelly is not called upon to testify on that point, does not deny the statement, and I must assume that it is true. Armstrong says he told them that they were going to New York, but a man named Jacobs, who keeps a clothing-store here, says Armstrong came to him Thursday or Friday, and bought some clothing, for the purpose of going to sea, and said he was going to make a trip to Europe. He is not so confident about his saying he was going to Liverpool as he is of buying the clothing, although he thinks he said he was going to Liverpool. Kelly, who I think is a very candid, fair witness, says they had a talk. He had been on boats on the lakes, and was told he would get $30 a month to a port in Europe, and he engaged to go. He said that was all their conversation; that upon their employment they went to Kelly's boarding-house, and remained all night. Armstrong pretends he did not know whose house it was, but I do not think Armstrong is a very ingenuous witness. However, it was Kelly's house.

On the morning of Saturday they went to the S. G. Reed with the petitioner. An expressman named Marx took their baggage down in a wagon. Two or three others of the crew were more or less intoxicated, but these two, I think, there is no question were duly sober. They walked to the dock where the steam-boat was, which it appears had taken the Noddleburn the night before down below Post-Office bar, in order to cross at high tide, and left her there. Kelly introduced these men to the master of the Noddleburn, who was on board, and they went on board, apparently of their own free will. Nobody urged them or assisted them, and the boat went to the mouth of the Wallamet river, and they were put on board the Noddleburn. When the master received these men on the S. G. Reed he said to the petitioner Kelly: "The articles are on board the ship, and I will have the men sign when we get to Astoria;" and that was the last that passed between them. Kelly remained here, and the ship went to Astoria. Some time before the ship reached there, I should judge, Armstrong went into the forecastle, and saw the articles, where he learned that the men who got $30 a month were able seamen. He had never been to sea, was a kind of farmer, and knew that he could not get $30 a month. He also heard the mate, or some other officer of the ship, say he would probably get two-pound-ten, or what he was worth. Evidently he was dissatisfied when this information was obtained, and when the S. G. Reed brought the Noddleburn to Astoria, and she dropped her anchor, and was loosening from the Noddleburn, Armstrong endeavored to get on board; but the ship's officers prevented, and the Reed then cleared the ship. But soon after,

Armstrong jumped overboard, and swam off, when a boat picked him up, and put him ashore, where he found a policeman, to whom he told his story, and by whom he was taken to the sheriff. The sheriff then asked him if there were any more persons on the ship in that condition. He said "Yes," there was another man there who wanted to get off, and the sheriff went aboard the vessel without any warrant, asking permission of the master, however, before he went on board. On board he found the man Kelly, who said he knew where he was going, but was expecting $30 a month; and added he was not an able-bodied seaman, and could not get $30 a month, and did not want to go; wanted to go ashore. The sheriff took him to the master, where this statement was repeated. After some altercation, the master said: "To hell with you," and the sheriff took the man ashore.

Immediately afterwards warrants were sworn out before the justice of the peace, A. A. Cleveland, against the petitioner, for having committed the crime defined in this statute which I have read, and the following day, Sunday, he was arrested in Portland. The warrant, I suppose, was indorsed by some justice of the peace here, although it does not appear so, and he was taken to Astoria, and committed to jail for hearing, and on the hearing he was committed to answer before the grand jury.

Now the question is whether this crime was committed when the men were put on the S. G. Reed or transferred to the Noddleburn, or whether it was not completed until she arrived in Clatsop county. The respondent's contention is that the crime was not completed until the Noddleburn arrived at Astoria, and was therefore committed partly in this county and partly in Clatsop county, and is justiceable in either, under section 1214 of the compilation of 1887, which reads:

"When a crime is committed partly in one county and partly in another, or the acts or effects thereof constituting or requisite to the consummation of the crime occur in two or more counties, an action therefor may be commenced and tried in either county."

At common law, a crime was only triable in the county where completely committed. A crime committed partly in one county and partly in another was not triable in either, and therefore could not be punished. But by St. 2 & 3 Edw. VI. c. 24, § 2, it was provided as follows:

"That where any person or persons hereafter shall be feloniously stricken or poisoned in one county, and die of the same stroke or poisoning in another county, that then an indictment thereof, found by jurors of the county where the death shall happen, etc., shall be as good and effectual in the law as if the stroke or poisoning had been committed and done in the same county where the party shall die, or where such indictment shall be so found."

This statute is considered a part of the common law brought over to this country by the colonies, being in and of it. It is the origin of section 1214 of our law, which extends the rule to all crimes.

The crime, if any, in this case was completed when the petitioner induced the men, Armstrong and Kelly, to go on board the S. G. Reed, in charge of the master of the Noddleburn, with the intent and expectation that they would be thus taken or go out of the state. What fol-

lowed after that did not affect him. If he was innocent then, he could not become guilty afterwards, and if he was guilty then, he could not be excused or absolved by what happened afterwards, as that the men left the ship at Astoria, and did not go to sea. Section 11 of the bill of rights of the constitution of the state provides: ·

"In all criminal prosecutions the accused shall have the right to public trial by an impartial jury in the county in which the offense shall have been committed." In my judgment, the preliminary examination of a person charged with crime is within the purview of this section, as being a part or stage of such "prosecution," and therefore must be had in the county where the crime was committed.

A warrant of arrest for crime must be issued by a magistrate of the county in which the same is committed or triable. Section 1553, Compilation of 1887. The warrant must be executed in the same county, unless indorsed by a magistrate out of the county. Section 1555, Id.

The jurisdiction of the grand jury is also confined to crimes committed or triable in the county. Sections 1230, 1236, 1242, Id. The word "triable" is used in the statute, so that a magistrate may issue a warrant for the offender where the offense is committed or may be tried. That, of course, is to meet the case provided for in the section, which declares that a crime committed partly in one county and partly in another may be triable in either; and that is all it is intended to meet. The Clatsop county justice assumed jurisdiction of a crime not committed or triable in his county, and his commitment is void, not due process of law. Being an officer of the state, his act is so far that of the state, and violates the fourteenth amendment, which prohibits any state from depriving "any person of life, liberty, or property without due process of law." Of course if there was a question of fact in this case as to whether this crime was committed in Clatsop county or not, or of the justice having authority to examine into the matter, his determination could not be questioned in this proceeding in this court. If he erred, the party would have to seek redress in the higher courts of the state. But my conclusion is—and I have considered it carefully, for it is a delicate and important question—that where, as here, it appears beyond a doubt that the crime was committed, not in Clatsop county, but in another, as this one, for instance, and the justice had no jurisdiction to hear or determine the proceeding, where it was usurpation from beginning to end, the commitment cannot be considered "due process of law." Beyond question, if a crime was committed by the petitioner,—of which I say nothing,—it was committed when the men were delivered to the master on the S. G. Reed; certainly when they were delivered on the Noddleburn in this county.

The only pretense of inveiglement on the part of the petitioner arises from the fact that he represented to the men that they would get $30 per month, when it appears that he ought to have known that they were not able-bodied seamen, and would not receive that rate of wages. But it further appears that the men were to sign the articles at Astoria, when they could see for themselves what wages they were to get, and, if they

were not satisfied with the same, they might refuse to go further, as they did. But it appears probable that the master did not really intend to ship the men formally before the British vice-consul at Astoria, as he should, but was about to take them along as and for the men who had signed the articles and failed to report for duty.

These had signed as able-bodied seamen, and Armstrong and Kelly, not being such, were liable to be disrated by the master on the voyage, and receive only what he saw proper to give them.

In this respect they would have been inveigled out of the state against their will, but by the misconduct of the master, rather than the petitioner, unless he acted with knowledge of the master's ulterior purpose. Against this conclusion is the fact that the master told him on leaving that he would "sign the men at Astoria."

My conclusion, therefore, is that this process, although sufficient on its face, is, upon the facts, unfounded, not "due process of law," and the petitioner must be discharged.