UNITED STATES, Appellee,

v.

James D. BLOCKER, Private First
Class U.S. Army, Appellant.

No. 64,633.
CM 8802049.

U.S. Court of Military Appeals.

Argued March 7, 1991.
Decided April 25, 1991.

For Appellant: *Captain Alan M. Boyd* (argued); *Colonel Robert B. Kirby* and *Lieutenant Colonel Russell S. Estey* (on brief).

For Appellee: *Captain Randy V. Cargill* (argued); *Colonel Alfred F. Arquilla, Lieutenant Colonel Daniel J. Dell'Orto, Captain Jonathan F. Potter* (on brief).

*Opinion of the Court*

SULLIVAN, Chief Judge:

In August 1988 appellant was tried by a general court-martial composed of officer and enlisted members at Frankfurt and Butzbach, Federal Republic of Germany. Contrary to his pleas, he was found guilty of rape and kidnapping, in violation of Articles 120 and 134, Uniform Code of Military Justice, 10 USC §§ 920 and 934, respectively. He was sentenced to a dishonorable discharge, confinement for 25 years, total forfeitures, and reduction to E–1. The convening authority approved the sentence. The Court of Military Review affirmed the findings of guilty and sentence in a memorandum opinion dated March 14, 1990.

On October 2, 1990, this Court granted review on the following questions of law: [1]

I

WHETHER THE EVIDENCE IS SUFFICIENT AS A MATTER OF LAW TO SUPPORT A FINDING OF GUILTY TO CHARGE II AND ITS SPECIFICATION (KIDNAPPING).

II (Modified)

WHETHER THE MILITARY JUDGE ERRED IN DENYING THE CHALLENGES FOR CAUSE AGAINST COLONEL NOLES AND COLONEL ROE.

We hold that the evidence of record was legally sufficient to support appellant's conviction for kidnapping. *See United States v. Hughes*, 716 F.2d 234, 239 (4th

[1] We heard oral argument in this case at the United States Military Academy at West Point, New York, on March 7, 1991, at the invitation of the Department of Law, United States Military Academy, and without objection from the parties involved.

The United States Court of Military Appeals conducts a hearing such as this outside its permanent courthouse in Washington, D.C., as part of its "Project Outreach," a public awareness project which demonstrates not only the operation of a Federal appellate court but also the quality and effectiveness of the criminal justice system of our Armed Services, the Uniform Code of Military Justice (Arts. 1–146, 10 USC §§ 801–946, respectively). It is hoped that the thousands of students, service persons, military and civilian attorneys, and members of the American public who witness these hearings will realize that America is a democracy that can maintain an Armed Force instilled with the appropriate discipline to make it a world power and yet afford the members of that Armed Force a fair and impartial justice system which does provide the full protection of the Constitution of the United States and Federal law to its members.

Cir.1983). We also hold that the military judge did not legally err in denying the challenges for cause. *See generally United States v. Murphy,* 26 MJ 454 (CMA 1988).

The parties to this appeal basically agree as to the evidence introduced in this case. Appellate defense counsel in his final brief summarized it in pertinent part as follows:

The evidence presented during the Government's case-in-chief established that Ms. [K] (age 17) and her friend, Ms. [C], visited the "Fifty–Fifty" Club located somewhere between Giessen and Wetzlar, Federal Republic of Germany, on the evening of 22 April 1988. [K] identified appellant as an individual she met that evening between 2200 and 2230 hours at the Fifty–Fifty Club. She testified that appellant wanted her name and phone number and proceeded to give her his name and telephone number on a torn piece of a beer coaster. She provided appellant with her first name and a false phone number. She did not tell appellant to "get lost" because he was a black person, and she was afraid he would react like another black person she met who "bothered [her] for a half an hour about racism" when she refused to give him her number.

[K] testified that she ended her conversation with appellant after their exchange of numbers, kept the piece of beer coaster until she got outside, and then threw it away at the suggestion of a friend. She then took a mini-car to the "Pupille" Club with [C] and two other friends. She saw appellant once again at around 0200 hours at the Pupille Club. He offered [C] and [K] a ride home after [K] told him that her ride did not show up. At first, both [K] and [C] were reluctant to ride with appellant, but he told her he could be trusted and flashed his military identification card at the request of [C].

[K], [C], and appellant left the club about five minutes later at approximately 0245 hours in a silver-gray Audi four door automobile driven by appellant.

Appellant first stopped at a gas station and purchased cigarettes, then he drove to Marburg to drop off [C]. At approximately 0330 hours, [K] and appellant left [C] and proceeded in the direction of [K]'s house. Appellant then turned onto a hiking path that led into the woods, drove 150 to 200 meters into the path, told [K] he had to urinate, then got out of the car and did so. [K] also left the vehicle, went a little further down the path, and relieved herself also.

According to [K], after she got back into the car, appellant started a "superficial conversation" concerning whether [K] had a boyfriend. She told him that she did. He then rolled down her seat and physically restrained her. She started to scream and cry while he pushed her skirt up, tore her panties down, removed her tampon (she was having her menstrual period), and proceeded to have sexual intercourse with her against her will.

According to [K], she then demanded that appellant take her home, but appellant called her names, again removed her clothes and raped her a second time. After the second rape, she put her clothes back on and ran towards the street. Appellant caught up with her and ordered her back into the car. She complied. He then tried to start a conversation with her and proceeded to rape her a third time.

(Record citations and footnote omitted.)

## I

Appellant generally asserts that the evidence of record was not sufficient to prove beyond a reasonable doubt that he kidnapped his victim prior to raping her. *See generally United States v. Harper,* 22 MJ 157, 161 (CMA 1986). In particular, he contends no evidence was presented, direct or circumstantial, that he intended to kidnap K at the time he offered to drive .her home or at any other time prior to her initial rape. *See* para. 92c(4) and (5), Part IV, Manual for Courts–Martial, United

States, 1984.[2] In making this argument he further suggests that there was no evidence that he made any false representations to K to induce her to enter his car or remain in it when he drove down the hiking path to the site of the rapes. *See* para. 92c(1). In sum, he argues that there was no evidence of any willful and wrongful inveiglement of K in this record of trial.[3]

■ Appellant's first contention requires us to more particularly delineate the necessary intent for the military offense of kidnapping charged as a violation of Article 134. Appellant was charged as follows in this case:

> SPECIFICATION: In that [appellant] did, in Marburg, Federal Republic of Germany, on or about 23 April 1988, willfully and wrongfully inveigle and hold [K][E] against her will.

In his final brief appellant variously refers to the required intent as an intent to kidnap, an intent to deceive, and an intent to rape. The military judge, however, instructed the members that, to be guilty of kidnapping, "[t]he accused must have specifically intended to hold the victim against the victim's will...." *Compare* § 12.04, 1 E. Devitt and C. Blackmar, *Federal Jury Practice and Instructions* 329 (1977); *Chatwin v. United States*, 326 U.S. 455, 460, 66 S.Ct. 233, 235, 90 L.Ed. 198 (1946), *with* para. 3–190, *Military Judge's Benchbook* (Change 1, February 1985).

■ We note that kidnapping as an offense under military law can be prosecuted in a number of ways. *See United States v. Scholten*, 17 MJ 171, 175 (CMA 1984). Here, the alleged offense occurred in Germany, so prosecution under Article 134 as explained in 18 USC 1201(a) was appropriate. *See United States v. Bartole*, 21 MJ 234 (CMA 1986). *Cf. United States v. Jeffress*, 28 MJ 409, 413 (CMA 1989). The intent requirement under this Federal statute is that the actus reus of this offense be *knowingly and willfully* done. *United States v. Pedroza*, 750 F.2d 187, 204 (2d Cir.1984); *United States v. Crosby*, 713 F.2d 1066, 1070–71 (5th Cir.), *cert. denied*, 464 U.S. 1001, 104 S.Ct. 506, 78 L.Ed.2d 696 (1983). *Cf. United States v. Santistevan*, 25 MJ 123 (CMA 1987). This intent requirement is consistent with the one provided in paragraph 92c(4), Manual, *supra*, and the instruction given by the military judge at appellant's court-martial. *See McClanahan v. United States*, 230 F.2d 919, 924 (5th Cir.), *cert. denied*, 352 U.S. 824, 77 S.Ct. 33, 1 L.Ed.2d 47 (1956). *See generally* R. Perkins and R. Boyce, *Criminal Law* 839–40 (3d ed.1982).

■ In resolving legal-sufficiency questions, this Court is bound to draw every reasonable inference from the evidence of record in favor of the prosecution. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Laboy*, 909 F.2d 581, 588 (1st Cir.1990); *United States v. Hart*, 25 MJ 143 (CMA

---

**2.** (4) *Willfully*. The accused must have specifically intended to hold the victim against the victim's will to be guilty of kidnapping. An accidental detention will not suffice. The holding need not have been for financial or personal gain or for any other particular purpose. It may be an aggravating circumstance that the kidnapping was for ransom, however. *See* R.C.M. 1001(b)(4).

(5) *Wrongfully*. "Wrongfully" means without justification or excuse. For example, a law enforcement official may justifiably apprehend and detain, by force if necessary (see R.C.M. 302(d)(3)), a person reasonably believed to have committed an offense. An official who unlawfully uses that official's authority to apprehend someone is not guilty of kidnapping, but may be guilty of unlawful detention.

*See* paragraph 21. It is not wrongful under this paragraph and therefore not kidnapping for a parent or legal guardian to seize and hold that parent's or legal guardian's minor child.

**3.** Paragraph 92, Part IV, Manual for Courts–Martial, United States, 1984, explains kidnapping as follows:

b. *Elements*.

(1) That the accused seized, confined, inveigled, decoyed, or carried away a certain person;

(2) That the accused then held such person against that person's will;

(3) That the accused did so willfully and wrongfully; and

(4) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

1987), *cert. denied*, 488 U.S. 830, 109 S.Ct. 85, 102 L.Ed.2d 61 (1988).[4] Thus, circumstantial evidence of the required intent will suffice, and we note evidence of the following was admitted in this case, *see generally United States v. Hughes*, 716 F.2d at 239: First, appellant knew that the victim had earlier rejected his nightclub overtures for an immediate social relationship. Second, appellant was also well aware of the victim's later uneasiness in accepting his offer of a ride home. Third, despite this knowledge, he precipitately and over the victim's implied objection[5] departed from the main road. Fourth, he drove her down this hiking path at 3:30 in the morning and to a depth of 150–200 meters into the dense woods in which she was clearly isolated and helpless. *See also Commonwealth v. Hughes*, 264 Pa.Super. 118, 399 A.2d 694, 698 (1979). Finally, he used force to have sex with his victim when he completed his urination and returned to the car. *Cf. United States v. Watkins*, 21 MJ 224, 227 (CMA), *cert. denied*, 476 U.S. 1108, 106 S.Ct. 1956, 90 L.Ed.2d 364 (1986). *See generally* 2 Wigmore, *Evidence* § 399 at 458–61 (Chadbourn rev.1979). In these circumstances, a rational factfinder could conclude beyond a reasonable doubt that appellant intended to take K and hold her against her will when he turned off the road and drove down the hiking path. *See United States v. Hughes, supra. See generally United States v. McCabe*, 812 F.2d 1060, 1062 (8th Cir.), *cert. denied*, 484 U.S. 832, 108 S.Ct. 108, 98 L.Ed.2d 67 (1987).

■ Appellant alternatively argues that the evidence of record does not show he "inveigled" K to remain in his car when he drove it off the highway and down the dirt hiking path. *Cf. United States v. Redmond*, 803 F.2d 438, 439 (9th Cir.1986), *cert. denied*, 481 U.S. 1032, 107 S.Ct. 1963, 95 L.Ed.2d 534 (1987). He contends that " '[i]nveigle' means to lure, lead astray, or entice by false representations" but notes his statements to K were true. *Cf. United States v. Hoog*, 504 F.2d at 51. He did need to urinate, and he did in fact urinate at the end of the hiking path as he told K he would.

Pertinent to appellant's second contention, we note that "inveigle," a part of the actus reus for kidnapping alleged in this case, is a word with a well established meaning. Paragraph 92 of the Manual states:

c. *Explanation.*

(1) *Inveigle, decoy.* "Inveigle" means to lure, lead astray, or entice *by false representations or other deceitful means.* For example, a person who entices another to ride in a car with a false promise to take the person to a certain destination has inveigled the passenger into the car. "Decoy" means to entice or lure by means of some fraud, trick, or temptation. For example, one who lures a child into a trap with candy has decoyed the child.

(Emphasis added.) This definition generally comports with the approach of Federal civilian courts to inveiglement as proscribed in 18 USC § 1201(a) and of various state courts as well. *See United States v. Macklin*, 671 F.2d 60, 65–66 (2d Cir.1982); *United States v. Hoog*, 504 F.2d 45 (8th Cir.1974), *cert. denied*, 420 U.S. 961, 95 S.Ct. 1349, 43 L.Ed.2d 437 (1975); *In re Kelly*, 46 F. 653, 655 (C.C.D. Ore. 1890). *See also State v. Collins*, 543 A.2d 641, 647 (R.I.1988); *State v. Amell*, 303 Or. 355, 736 P.2d 561, 563–64 (1987). It is not as limited as appellant implies and a partial truth in the inducement or a pretext does not preclude a finding of inveiglement. *E.g.,*

---

4. Senior Judge Everett makes a reasonable argument in defense of appellant. However, the factfinders, exercising their unique powers also in a reasonable manner, did not agree with this view of the facts. Unlike the Court of Military Review, we are bound by their conclusions, absent legal error. *See generally United States v. Laboy*, 909 F.2d 581, 588 (1st Cir.1990).

5. The victim testified, "I was upset and I said, 'Where are you going?' and 'What do you want here? I want to go home.' " The record further shows that the victim testified that appellant told her he wanted to go to the bathroom to "relieve himself," and she "was at ease at that point."

*State v. Damewood,* 245 Kan. 676, 783 P.2d 1249, 1258 (1989).

The record before us shows that earlier in the evening, appellant had made overtures of a social or romantic nature to the victim which she rebuffed. It also shows that appellant subsequently drove her in his car to a spot in the dense woods which was well beyond that necessary for a private urination. This positioning of the victim (150–200 meters from the road in a dense forest) facilitated or permitted him to engage in sex with her despite her protests in practical seclusion. Finally, the record shows that appellant returned to the car after his urination and immediately proceeded to rape the victim three times. A reasonable factfinder could infer from this evidence that appellant's sexual interest in the victim that evening was constant and, therefore, he intended to have sex with her when he redirected his vehicle down the hiking path. Consequently, such a factfinder could also find that appellant's representation of his purpose as urination was so incomplete or false in implication as to be deceitful. *See also United States v. Arondel De Hayes,* 22 MJ 54, 56 (CMA 1986). Such evidenced conduct constitutes inveiglement for purposes of Article 134. *See also State v. French,* 139 Vt. 320, 428 A.2d 1087 (1981); *State v. Amell, supra.*

## II

The second granted issue broadly asks whether the military judge erred in denying the challenges for cause against two prospective members of appellant's court-martial. Colonel Roe actually sat in this case, but Colonel Noles was removed from this court-martial by the defense by means of a subsequent peremptory challenge. Defense counsel noted for the record that he would have exercised his peremptory challenge against a different member, Cap-

tain Hume, if the challenge for cause against Colonel Noles had been granted.

Turning to the record of trial, we note that civilian defense counsel objected, *inter alia,* to both colonels sitting on the court-martial because of their substantial seniority to other members of the panel. The remaining panel members were Lieutenant Colonel Cavanaugh, Command Sergeant Major Barker, First Sergeant Martin, First Sergeant Baker, and Sergeant First Class Dela Cruz. His basic argument was that an appearance of fairness problem existed because these senior officers would naturally dominate their subordinates in reaching required judgments.

■ Article 25, UCMJ, 10 USC § 825, provides for appointment of commissioned officers, warrant officers, and enlisted persons to a court-martial. The panel composition or its mix is left to the convening authority. Art. 25(d)(2). The mere fact that senior officers serve with subordinate personnel on the same panel does not violate due process, and we do not find it fundamentally unfair. *See generally Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). Moreover, the standard instruction on the independence of court members was given in this case.[6] In this light, disparity of rank creates no appearance of unfairness as contemplated in RCM 912(f)(1)(N), Manual, *supra.*

■ On appeal, appellant expands his trial objection to the judge's ruling based on rating relationships. He notes, as he did at trial, that each of the two colonels was involved in the rating process of a different enlisted soldier on the panel. He then additionally complains that the judge should have questioned the involved panel members concerning any possible impact of these reporting relationships. We disagree on both counts.

---

6. The military judge instructed as follows:

Now, when you go into the deliberation room, I remind you again, you all are fulfilling a role identical to that of a juror in the civilian community and rank doesn't play any part at all in your free and full deliberations. As I told you, the senior member, Colonel

Roe, is the president and fulfills a function similar to a jury foreman. In that case, he will preside over the closed deliberations. Colonel Roe, in this connection, you can vote on which charge you want to consider first, subject to an objection by a majority of the court members.

■ The burden to establish a basis for a challenge for cause rests with the party making the challenge. *See* RCM 912(f)(3). The mere fact of a rating relationship between members, like a senior-subordinate relationship, does not generally give rise to a challenge for cause. *See United States v. Murphy, supra,* 26 MJ 454. Of course, appellant was entitled to question these prospective members about their service relationships and any particular problems that may arise therefrom. RCM 912(d). Nevertheless, the omnipresence of these relationships suggests that a *sua sponte* inquiry by the judge was not required. *Cf. United States v. Reichardt,* 28 MJ 113, 116 (CMA 1989); *United States v. Harris,* 13 MJ 288, 292 (CMA 1982).

■ Appellant also asserts that his challenge for cause should have been granted against Colonel Noles because he was commanding officer of the community where the offenses occurred; he previously visited one of the clubs involved in this case pursuant to his duties; and he could not recall whether he saw anything about this incident on his blotter. These circumstances by themselves do not establish any *per se* disqualification for his sitting as a court-martial member in this case. *See generally United States v. Reynolds,* 23 MJ 292 (CMA 1987). *Cf. United States v. Harris, supra* 13 MJ at 292.

The decision of the United States Army Court of Military Review is affirmed.

Judge COX concurs.

EVERETT, Senior Judge (dissenting):

Reluctantly, I must dissent from both aspects of the majority opinion. Instead, I would set aside the guilty finding as to kidnapping and dismiss that Charge; and I would set aside the remaining findings, as well, and authorize a rehearing by a new panel of members.

I

The prosecution was required to prove that appellant had "willfully and wrongfully inveigle[d]" his victim in order to convict him of kidnapping. As the majority opinion correctly states, " 'Inveigle' means to lure, lead astray, or entice by false representations or other deceitful means." Para. 92c(1), Part IV, Manual for Courts-Martial, United States, 1984. Thus, for this Court to sustain this charge of kidnapping, we must find some evidence upon which rational factfinders could have found beyond a reasonable doubt that appellant had duped his victim to go to the geographic location of the rape by using "false representations or other deceitful means." *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

The Government's theory is that appellant did so on either or both of two occasions: First, when he offered his victim and her friend a ride home and assured them, in response to their reluctance to go with a stranger, that they could trust him; second, when he departed the main road and headed down a hiking path and explained, in response to his victim's verbal protest/inquiry, that he did so because he had to urinate. If there is any *evidence,* when viewed in the light most favorable to the Government, upon which the factfinders could have found such deceit, then appellant's claim of legal insufficiency of the evidence would fail. *See id.*

Unfortunately, instead of any *evidence*— even circumstantial evidence from which reasonable *inferences* of such deceit could be drawn—all I find is *speculation.* There literally is *nothing* to suggest that, on either occasion, appellant did not mean exactly what he said when he said it. Hopefully, none of us is so far removed in years from our days of courting that we could infer an evil intent from a young man's renewal of attention or an offer for a ride home after a girl has once declined; many successful relationships would never have blossomed if every young man was logically and legally required to accept that first brush-off or else later risk the inference that, all along, he intended at that moment to pursue his desires forcefully.

As to Blocker's explanation for pulling off the road, again there is nothing to

suggest that this was anything except truthful. Both appellant and his victim had been at social clubs for many hours; and it had been over 45 minutes since they had departed the club in appellant's car. Indeed, the victim testified at trial that, when appellant left the car to urinate as he had said he had to do, she likewise "urgently had to urinate myself" and so exited the car right after appellant. When trial counsel asked her why she did not wait until she "got home," she explained, "It would have been another 10 minutes and as I said I had to urgently go." In light of such testimony and under the circumstances described, how could any reasonable inference be drawn that appellant was lying when he explained that he was leaving the road because he had to relieve himself?

Moreover, even if one assumes (though not from the *evidence*) that appellant additionally intended to make a romantic advance on the prosecutrix once he had relieved himself, there still is an absence of any evidence at all that, if she resisted, he intended to force himself upon her against her will. The majority concludes, "A reasonable factfinder could infer from this evidence that appellant's sexual interest in the victim that evening was constant and that *he intended to have sex with her* when he redirected his vehicle down the hiking path." 32 MJ at (286) (emphasis added). Nonetheless, this evidence does not permit the logical leap that, if she resisted his efforts to have sex with her, he further intended to *force* the matter—and *that* precisely is the problem with the state of the evidence in this case.

The evidence is adequate to convince a factfinder that appellant did, ultimately, thrice commit this crime of personal violation; and he should be punished for it. But our personal disgust with these crimes must not cloud our judicial search for *evidence* of a *different* crime.*

I don't know *when* appellant first formed his intent to hold his victim against her will and take what he wanted from her: It might have been sometime right after she first had rebuffed him; it might have been when he offered her and her friend a ride home (but, recall that it was the *prosecutrix*—not appellant—who decided to drop her friend off first, then herself); it might have been just prior to pulling off the road; it might have been while he was urinating; or it might have been at the point when, after returning to the car and engaging in some idle chatter, he offered his affections and she resisted.

I don't know—and I don't find any basis at all in the *evidence* for *anyone* to know.

## II

I am constrained to note two points of disagreement with the majority as to the second issue.

First, I do not read defense counsel's objection to the colonels so narrowly as does the majority—that is, based solely on "their substantial seniority to other members of the panel." 32 MJ at (286). Instead, I believe counsel's expressed concern was with the military relationship between the colonels and several noncommissioned officers on the panel, not merely with their difference in rank.

For instance, counsel began his objection as to Colonel Noles by noting: "Your Honor, we have the unfortunate situation where 3d Armored Division with several thousand members has created a jury in which a brigade commander has (1) *his* sergeant major; and (2) a platoon sergeant [under that sergeant major]." (Emphasis added.) Later, he explained his objection to Colonel Roe as one based, in part, "once again [on] the superiority/subordinate relationship between Colonel Roe and uh ... First Sergeant Baker." He made no notice at all regarding the *rank* disparity between

---

* I am somewhat concerned about efforts to overcharge in rape cases. Conviction of rape carries a possible maximum sentence including death. Art. 120, Uniform Code of Military Justice, 10 USC § 920; *see* para. 45e, Manual for Courts-Martial, United States, 1984. To add a charge of kidnapping—especially where such a charge is as strained as it is here on the facts—seems like overkill.

the colonels on the one hand and the whole remainder of the panel on the other.

Accordingly, I believe that defense counsel, loudly and clearly, raised before the military judge his concern with the relationship between the two colonels and three noncommissioned officers on the court.

Second, in that circumstance, I believe the military judge had a *sua sponte* duty—in the interest of ensuring the fairness, in fact and appearance, of the proceedings, *see* RCM 912(f)(1)(N), *Manual, supra*—to inquire of the parties concerned whether the military relationships involved would affect in any way their duties as court members. *See United States v. Smart*, 21 MJ 15 (CMA 1985). Our decision in *United States v. Murphy*, 26 MJ 454 (CMA 1988), held that such a relationship is not an automatic disqualifier from common panel service; but it did not excuse the military judge from fulfilling his general responsibility to assure a fair proceeding by affirmatively inquiring into that relationship and its possible effect. Indeed, the military judge in *Murphy* had done just that.

Additionally, decisions by the Army Court of Military Review that preceded our decision in *Murphy* should have led the military judge here to conduct such an inquiry under these circumstances. *See, e.g., United States v. Garcia*, 26 MJ 844 (1988); *United States v. Eberhardt*, 24 MJ 944

(1987). Command influence is anathema to military justice; I would have hoped that, especially in this command—the 3d Armored Division, *see United States v. Thomas*, 22 MJ 388 (CMA 1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987)—this military judge would have been more sensitive and more responsive to defense counsel's expressed concerns by, at a minimum, conducting an appropriate and reassuring inquiry of the parties.

I conclude by repeating what I urged in my separate opinion in *Murphy:*

> [I]mpartiality can be assured by means of proper *voir dire* on the part of the judge and counsel, liberality in granting challenges for cause, and instructions by the military judge to the court-martial members that for anyone to consider their performance as members in preparing a fitness report would violate the Uniform Code of Military Justice....

26 MJ at 458. Of course, the best way to assure the fairness that these measures seek is to avoid the situation in the first place. As Judge Cox wrote in a footnote to his lead opinion in *Murphy:* "I shall go on record as agreeing with the principle that convening authorities should avoid placing superior-subordinate combinations on courts-martial to the extent practicable." *Id.* at 456 n.\*. I, too, agree.