# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

**v.**

### Senior Airman JONATHAN T. DANIEL
### United States Air Force

### ACM 38322

### 01 April 2014

Sentence adjudged 25 January 2013 by GCM convened at Altus Air Force Base, Oklahoma. Military Judge: J. Wesley Moore.

Approved Sentence: Dishonorable discharge, confinement for 12 months, and reduction to E-1.

Appellate Counsel for the Appellant: Captain Isaac C. Kennen.

Appellate Counsel for the United States: Colonel Don M. Christensen; Lieutenant Colonel C. Taylor Smith; and Gerald R. Bruce, Esquire.

Before

HELGET, WEBER, and MITCHELL
Appellate Military Judges

OPINION OF THE COURT

This opinion is subject to editorial correction before final release.

HELGET, Senior Judge:

A general court-martial composed of officer members convicted the appellant, contrary to his pleas, of one specification of abusive sexual contact, in violation of Article 120, UCMJ, 10 U.S.C. § 920.[1] The members sentenced the appellant to a dishonorable discharge, confinement for 12 months, and reduction to E-1. The convening authority approved the adjudged sentence.

---

[1] Consistent with his pleas, the appellant was found not guilty of one specification of sexual assault, in violation of Article 120, UCMJ, 10 U.S.C. § 920.

Before this Court, the appellant raises two assignments of error: (1) Whether the Government violated the appellant's Fifth Amendment[2] right to due process of law by prosecuting him before a court-martial panel of six members whose verdict did not have to be unanimous; and (2) Whether the evidence at trial was factually and legally sufficient to prove the conviction beyond a reasonable doubt. Finding no error that materially prejudices a substantial right of the appellant, we affirm.

*Background*

On 14 July 2012, the victim in this case, Staff Sergeant (SSgt) LK, and her friend, SSgt JM, who were both assigned to Altus Air Force Base, Oklahoma, decided to go to Oklahoma City to spend a night out on the town. SSgt LK had previously planned that they would meet up with Senior Airman (SrA) RM, who was one of her male friends.

Shortly after checking into their hotel room, at approximately 1600, SSgt LK and SSgt JM went to SrA RM's room, which by coincidence ended up being just across the hall. Upon entering SrA RM's room, SSgt LK and SSgt JM were introduced to the appellant and Airman First Class (A1C) CB, who were staying with SrA RM. SSgt LK had not previously met the appellant. While in SrA RM's room, SSgt LK drank about half a shot of Grey Goose vodka. At approximately 1830, SSgt LK and SSgt JM went with the appellant, SrA RM, and A1C CB to a local restaurant. They drove together in SrA RM's vehicle.

While at the restaurant, SSgt LK drank approximately one mixed drink and four to five shots of various kinds of alcohol. At some point during dinner SSgt LK and the appellant went outside to smoke, and the appellant informed her that SrA RM was attracted to her. SSgt LK responded that she was not interested in starting a relationship with SrA RM or anyone else that night, as she was in the process of starting a relationship with someone else.

After dinner, the appellant drove the entire group back to the hotel. Between 2200-2230, they all took a shuttle to downtown Oklahoma City and eventually ended up at the CityWalk club. While at the CityWalk, SSgt LK danced with the appellant and at some point he rubbed her feet for a few minutes, but according to her nothing romantic happened between them.

SrA RM decided to leave the club early and returned to the hotel. The rest of the group stayed at the CityWalk until around 0130 on 15 July 2012. On the way back to the hotel the appellant and A1C CB could not reach SrA RM and, as a result, did not have a place to stay for the night. According to SSgt LK, she discussed the issue with SSgt JM and they agreed to allow the appellant and A1C CB to stay in their room as they were

---

[2] U.S. CONST. amend. V.

both Airmen. SSgt LK's understanding was that the male Airmen were going to sleep on the floor, but SSgt JM understood that they were just going to work something out with them. On the walk back to the hotel, the appellant gave SSgt LK his shoes, because her feet were hurting from wearing heels, and he also carried her for part of the way. According to SSgt LK, the appellant made no sexual advances toward her on the way back to the hotel.

Upon arrival to the hotel, the appellant and A1C CB stayed downstairs to smoke while SSgt LK and SSgt JM went upstairs to their room and proceeded to get ready for bed. SSgt LK changed into her pajamas consisting of a V-cut shirt and a pair of black drawstring shorts. She was also wearing a bra and underwear. There were two beds in the room, and SSgt LK decided to sleep on the bed closest to the door and furthest from the bathroom. She remembered only SSgt JM and A1C CB in the room when she went to sleep. She understood that the appellant would be sleeping on the floor.

For her part, SSgt JM testified that after she changed into her pajamas, she came out of the bathroom and saw SSgt LK, the appellant, and A1C CB all standing at the foot of the beds. She then went back into the bathroom to wash her face. When she came back out, everyone was lying down in the beds and appeared to be asleep. A1C CB was in one bed, and SSgt LK and the appellant were in the other bed closest to the door, under the covers. SSgt JM did not witness anything romantic occur between SSgt LK and the appellant.

SSgt LK testified that the next thing she remembered was waking up with the appellant's fingers in her vagina.[3] She also felt the appellant's penis on her left leg inside her upper thigh near her genitalia. Her shirt was pulled down and her right breast was exposed. Her shorts and underwear had also been pulled down to her thighs. She immediately jumped out of bed and started screaming, "Where the f[**]k is the light[?] Where the f[**]k is the light[?]" She was mad and scared. When someone turned on the lights, she saw the appellant on the opposite side of SSgt JM's bed pulling up his pants and putting his shoes on. SSgt JM and A1C CB were sitting up in the other bed and asked what was happening. SSgt LK looked at A1C CB and stated, "Why does your friend think it is okay to f[**]kin stick his fingers inside me when I was sleeping?" SSgt JM then told the appellant to leave. As the appellant started to leave, SSgt LK punched him four to five times in his chest and back and yelled at him to leave. The appellant departed without saying a word.

---

[3] The appellant was found not guilty of the Charge that alleged, as a violation of Article 120, UCMJ, the appellant "commit[ted] a sexual act upon Staff Sergeant [LK], by penetrating the vulva of the said Staff Sergeant [LK] with his finger when he knew or reasonably should have known that the said Staff Sergeant [LK] was asleep, with an intent to gratify the sexual desire of [the appellant]." The appellant was convicted, in violation of Article 120, UCMJ, of the Additional Charge, for "touch[ing] directly the inner thigh of Staff Sergeant [LK] when [the appellant] knew or reasonably should have known that the said Staff Sergeant [LK] was asleep, with an intent to gratify the sexual desire of the [appellant]."

SSgt JM testified that SSgt LK pounded on the wall, yelled for someone to turn on the lights, and yelled at the appellant, "I never invited you into my bed. Get out of my bed. You had your fingers inside my vagina. You were trying to put your penis inside my vagina."

SSgt LK then went into the bathroom with SSgt JM. While in the bathroom, SSgt LK cried hysterically and tried to tell SSgt JM what happened. She then decided to call her friend, Special Agent JH, Air Force Office of Special Investigations, and at his direction she called 911 and reported the incident.

SrA RM testified that he woke up at approximately 0400 to the appellant banging on the door. The appellant told SrA RM that the girls had kicked him out of the room and proceeded to go to bed.

*Fifth Amendment Right to Due Process*

The appellant contends that the Government violated his Fifth Amendment right to due process of law because he was prosecuted by a court-martial panel consisting of only six members whose verdict did not have to be unanimous. The appellant relies on the Supreme Court's rulings in *Ballew v. Georgia*, 435 U.S. 223 (1978), and *Burch v. Louisiana*, 441 U.S. 130 (1979), to support his position that he was entitled to a jury with at least six members and that he could only be found guilty by a unanimous vote. In *Ballew*, the Supreme Court held that a trial consisting of a jury of less than six persons deprives a defendant of the right to trial by a jury as contemplated by the Sixth Amendment.[4] 435 U.S. at 245. The decision was based on empirical studies showing that "the purpose and functioning of the jury in a criminal trial is seriously impaired, and to a constitutional degree, by a reduction in size to below six members." *Id.* at 239. Subsequently, in *Burch*, the Court held that conviction by a non-unanimous six-member jury also fails to comply with the Sixth Amendment, saying:

> [M]uch the same reasons that led us in *Ballew* to decide that use of a five-member jury threatened the fairness of the proceeding and the proper role of the jury, lead us to conclude now that conviction for a nonpetty offense by only five members of a six-person jury presents a similar threat to preservation of the substance of the jury trial guarantee and justifies our requiring verdicts rendered by six-person juries to be unanimous.

441 U.S. at 138.

In *O'Callahan v. Parker*, 395 U.S. 258 (1969), *overruled on other grounds by Solorio v. United States*, 483 U.S. 435 (1987), the Supreme Court explained:

---

[4] U.S. CONST. amend. VI.

The Constitution gives Congress power to "make Rules for the Government and Regulation of the land and naval Forces," and it recognizes that the exigencies of military discipline require the existence of a special system of military courts in which not all of the specific procedural protections deemed essential in Art. III trials need apply. The Fifth Amendment specifically exempts "cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger" from the requirement of prosecution by indictment and from the right to trial by jury. The result has been the establishment and development of a system of military justice with fundamental differences from the practices in the civilian courts.

*Id.* at 261-62 (citation and emphasis omitted).

If the case does not arise in the land or naval forces, then the accused gets, first, the benefit of an indictment by a grand jury and, second, a trial by jury before a civilian court as guaranteed by the Sixth Amendment and by Article III, Section 2, of the Constitution,[5] which provides, in part:

The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

While the Sixth Amendment requires trial by jury in Federal criminal cases, and that jury's composition must be a representative cross-section of the community, courts-martial have never been considered subject to the jury-trial demands of the Constitution. *United States v. McClain*, 22 M.J. 124, 128 (C.M.A.1986); *see also O'Callahan*, 395 U.S. at 261-62. Our superior court recently re-emphasized that the Sixth Amendment right to a jury trial does not apply to courts-martial. *United States v. Easton*, 71 M.J. 168, 175 (C.A.A.F. 2012) (citing *Ex parte Quirin*, 317 U.S. 1, 39 (1942); *United States v. Wiesen*, 57 M.J. 48, 50 (C.A.A.F. 2002)).

We find the authorities cited by appellant to buttress his claim of a due process violation, *Ballew* and *Burch*, do not in any way limit the power of Congress to create rules for courts-martial pursuant to Article I, Section 8 of the Constitution.[6] Consistent with our superior court's precedent, courts-martial are not subject to the same jury requirements as other criminal trials. Accordingly, this issue is without merit.

---

[5] U.S. CONST. art. III, § 2.
[6] U.S. CONST. art. I, § 8.

*Legal and Factual Sufficiency*

The appellant asserts that the evidence at trial was not factually and legally sufficient to prove the conviction for abusive sexual contact. We review issues of factual and legal sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987), *quoted in United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *Turner*, 25 M.J. at 324, *quoted in United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citing *United States v. Rogers*, 54 M.J. 244, 246 (C.A.A.F. 2000); *United States v. Blocker*, 32 M.J. 281, 284 (C.M.A. 1991)). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993).

The elements of abusive sexual contact, in violation of Article 120, UCMJ, as instructed by the military judge, are:

(1) That at or near Oklahoma City, Oklahoma, on or about 15 July 2012, the accused committed sexual contact upon [SSgt LK], to wit: touching directly the inner thigh of [SSgt LK]; and

(2) That the accused did so when he knew or reasonably should have known that [SSgt LK] was asleep.

The military judge further instructed the members that "sexual contact" means:

(A) touching, or causing another person to touch, either directly or through the clothing, the genitalia, anus, groin, breast, inner thigh, or

buttocks of any person, with an intent to abuse, humiliate or degrade any person; or

(B) any touching, or causing another person to touch, either directly or through the clothing, any body part of any person, if done with an intent to arouse or gratify the sexual desire of any person. Touching may be accomplished by any part of the body.

In support of his claim of legal and factual insufficiency, the appellant essentially attacks the credibility of SSgt LK and argues that no reasonable factfinder could have found her testimony sufficient to establish guilt beyond a reasonable doubt. The appellant highlights differences between her Article 32, UCMJ, 10 U.S.C. § 832, testimony and her in-court testimony, primarily concerning the location of the appellant's penis on her body.

We have reviewed and considered the entire record of trial and find that although there are some relatively minor inconsistencies concerning SSgt LK's testimony, her recounting of what happened on the night of 14-15 July 2012 was very consistent with the testimony of the other witnesses who were present that evening. The evidence shows that she was not romantically interested in the appellant, she fell asleep and did not invite him to join her in bed, and she awoke with the appellant's penis touching her inner thigh.

We have considered the evidence in the light most favorable to the prosecution. We have also made allowances for not having personally observed the witnesses. Having paid particular attention to the matters raised by the appellant, we find the evidence factually and legally sufficient to support his conviction for abusive sexual contact.

*Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the approved findings and sentence are

AFFIRMED.

FOR THE COURT

STEVE LUCAS
Clerk of the Court