# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

---

## UNITED STATES

**v.**

## Staff Sergeant TODD J. BARLOW
## United States Air Force

### ACM 37981

### 13 March 2014

Sentence adjudged 24 June 2011 by GCM convened at Beale Air Force Base, California. Military Judge: Jeffrey A. Ferguson (sitting alone).

Approved Sentence: Dishonorable discharge, confinement for 36 months, and reduction to E-1.

Appellate Counsel for the Appellant: Major Matthew T. King; Captain Luke D. Wilson; and James D. Culp, Esquire.

Appellate Counsel for the United States: Colonel Don M. Christensen; Lieutenant Colonel C. Taylor Smith; Major Brian C. Mason; Major John M. Simms; Major Charles G. Warren; and Gerald R. Bruce, Esquire.

Before

ROAN, MARKSTEINER, and WIEDIE
Appellate Military Judges

This opinion is subject to editorial correction before final release.

---

WIEDIE, Judge, with whom MARKSTEINER, SJ., joins:

A general court-martial composed of a military judge sitting alone convicted the appellant, contrary to his pleas, of two specifications of maltreatment; two specifications of wrongful sexual contact[1]; one specification of indecent exposure; one specification of forcible sodomy; and one specification of indecent acts, in violation of Articles 93, 120, 125, and 134, UCMJ, 10 U.S.C. §§ 893, 920, 925, 934. The adjudged sentence consisted of a dishonorable discharge, confinement for 36 months, and reduction to E-1. With the

---

[1] The appellant was found not guilty of two specifications of abusive sexual contact, but guilty of the lesser included offense (LIO) of wrongful sexual contact for each specification.

exception of the automatic forfeitures, the convening authority approved the sentence as adjudged.

On appeal, the appellant argues: (1) His convictions for wrongful sexual contact must be set aside because wrongful sexual contact is not a lesser included offense (LIO) of abusive sexual contact; (2) The evidence is factually and legally insufficient to prove his guilt of wrongful sexual contact, forcible sodomy, and maltreatment; (3) The military judge erred by improperly excluding Mil. R. Evid. 412 evidence concerning Airman First Class (A1C) GG's adulterous relationship with another airman; and (4) He received ineffective assistance of counsel.

*Background*

In February 2007, A1C KT arrived at her first duty station, Beale Air Force Base (AFB), California, and was assigned to the 9th Security Forces Squadron (SFS). Upon arrival at Beale AFB, she was assigned to the same flight as the appellant.

A1C KT and the appellant were frequently assigned to patrol together, as often as four times a week. As a Staff Sergeant, the appellant was the senior patrolman when they teamed up and he was in charge of the vehicle. A typical patrol lasted 12 hours and consisted of driving a SFS vehicle around a sector of the base.

During their shifts, the appellant and A1C KT would discuss a number of topics both duty-related and personal. Eventually, the appellant began making comments of a sexual nature to A1C KT. He would comment on the size of A1C KT's breasts and ask her to show them to him. A1C KT did not report his comments; she did not believe anything would be done because she was just an airman and he was a noncommissioned officer (NCO) and also because of the "atmosphere" in the 9th SFS. In the presence of other squadron members, a squadron Captain had referred to A1C KT as "Tits McGee," and another Airman told her, "I just want to f[***] you." According to A1C KT, these comments elicited laughter from other squadron members.

The appellant continued to make comments about A1C KT's breasts and ask to see them. In an attempt to get him to stop "bugging" her, A1C KT decided to show him her breasts. While in their patrol car, she lifted her shirt and bra, exposing her breasts. She immediately attempted to pull down her shirt and bra again, but the appellant pushed her hands back up. He then grabbed her nipples and sucked on her breasts despite the fact she told him "no."

Soon after this incident, A1C KT was tasked to deploy. She attended deployment training in July 2007 and proceeded to Camp Bucca, Iraq. The appellant was also tasked to deploy to Camp Bucca during the same time period.

While deployed, A1C KT had various duties, one of which was to man a guard tower. Guard tower duty consisted of a four-hour shift and was performed alone. When she was alone in the tower, the appellant would often visit and rub her legs and make comments about her body and her chest in particular. The appellant's conduct progressed to the point where he grabbed her hand and placed it on his penis, over his pants, and touched her between the legs over her clothing. On one occasion, he exposed his penis and put her hand on it. He also put his hand down her pants inside her underwear and touched her vulva.

As at Beale AFB, A1C KT did not report the appellant's conduct because of concern about negative consequences if she did. She did, however, ask people to switch tower shifts with her and asked roving patrols to remain at the tower with her in order to avoid being alone with him.

While A1C KT was manning a tower one evening, the appellant arrived and became even more persistent than he had been other times, repeatedly asking A1C KT to perform oral sex on him. She told him "no" multiple times. The appellant remained at the tower for approximately two hours. Throughout the evening, he kept asking A1C KT to perform oral sex on him. At one point he told her that if she gave him a "blow job" he would "leave her alone forever." Thinking she could get him to leave her alone, A1C KT initially agreed to perform oral sex. The appellant exposed his penis and A1C KT put her mouth on it. As soon as she took the appellant's penis in her mouth, she changed her mind and attempted to pull her head back. To prevent her from pulling away, the appellant put his hands on the back of A1C KT's head and pushed her down on his penis. She continued to try to pull away, and he continued to prevent her from doing so until he ejaculated. When he finally released his grip on A1C KT's head, she fell over backwards because she had been attempting to pull away. After the incident, A1C KT vomited over the side of the tower and the appellant left.

A1C GG arrived at Beale AFB in 2010. She was 17 years old and, like A1C KT, fresh out of technical school when she was assigned to the 9th SFS. A1C GG's impression of the appellant was that he was an NCO who could have an impact on the career of a young Airman. A1C GG first met the appellant at a squadron booster club meeting. At his request, she got pizza for him during the meeting. Following the meeting, the appellant obtained A1C GG's cell phone number from the unit recall roster or unit board and called her. She did not answer the call. He left a message thanking her for getting him pizza, but also asked why she had not answered her phone.

On 26 August 2010, following their initial meeting, the appellant and A1C GG began exchanging numerous e-mails as well as text messages. On that first day they exchanged 100 e-mails and the appellant steered the dialogue in a direction of a sexual nature, asking A1C GG what type of underwear she was wearing. They also discussed going to lunch or dinner together at some point.

ACM 37981

On 27 August 2010, the appellant picked A1C GG up on base and drove to an off-base Burger King. The pair went through the drive-thru and A1C GG paid for both lunches. On the drive back to base, the appellant pulled into the parking lot of a vacant store. After they parked, he placed a sunscreen in the window of the vehicle. They talked for a little while before the appellant attempted to kiss A1C GG. When she pulled away from him, he pulled her face to his and they kissed for a brief period of time. He then moved his hand to her belt, but she told him, "No, I don't work like that." The appellant responded by undoing his pants and exposing his penis. He asked A1C GG if she liked it and wanted to touch it. She shook her head "no."

The appellant put his penis back in his pants and climbed into the back seat of his vehicle. From the backseat, he reached around A1C GG and touched her breasts over her uniform. She attempted to shift her feet, and when she did so, he pulled her into the back seat. The appellant pulled A1C GG's ABU top down so that it rested at her elbows and fondled her breasts. After the appellant withdrew his hand from her shirt and while A1C GG was attempting to put her ABU top back on, he put his hand down the front of her pants, under her underwear, and touched her vulva.

Following this incident, the appellant drove back to base and dropped A1C GG off near the squadron. They exchanged numerous e-mails during the rest of the afternoon, in which A1C GG gave the impression that she liked what had happened and wanted more to occur. She later explained she did so because she was afraid of what the appellant would do if she indicated she had a problem with what had happened. An additional 78 e-mails were exchanged between them on Monday, 30 August 2010.

After returning to the squadron following the 27 August 2010 lunch incident, A1C GG encountered her friend and fellow squadron member, Airman (Amn) JC. Amn JC noticed that A1C GG was shaking and was "wide eyed like she was holding a secret." A1C GG told Amn JC what had transpired in the parking lot on the way back from lunch.

On 28 August 2010, A1C GG also told her fiancé at the time, A1C AK, what had happened. A1C GG and A1C AK had met just before starting tech school. At the time of the conversation, A1C AK was stationed at Incirlik Air Base, Turkey.

On 27 August 2010, A1C GG told Senior Airman (SrA) BM that the appellant sexually assaulted her. SrA BM reported the assault to his chain of command approximately three weeks later. Eventually, the Air Force Office of Special Investigations (AFOSI) was notified and an investigation was initiated. SrA BM was A1C GG's sponsor when she arrived at Beale AFB. Although there was disagreement as to the exact start date, at some point on or after 29 August 2010, SrA BM and A1C GG became romantically involved despite the fact SrA BM was married to another woman at

ACM 37981

the time. The affair was discovered during the investigation of the appellant's assault of A1C GG. Both A1C GG and SrA BM were disciplined for the improper relationship. At the time of trial, A1C GG was pregnant with SrA BM's child.

The appellant was brought in for questioning by agents from AFOSI on 22 October 2010. At the outset of the interview, an AFOSI agent read the appellant his Article 31, UCMJ, 10 U.S.C. § 831, rights. After the rights advisement, the appellant was asked if he wanted a lawyer. He stated he wanted a lawyer but that he was willing to answer questions because he did not understand what was going on. The AFOSI agent sought to clarify with the appellant whether he wanted to stop the questioning and speak with a lawyer or whether he wanted to answer questions. The appellant asked if he would be able to stop the questioning at any point if he later decided he wanted to consult with an attorney. The AFOSI agent responded that the appellant had the right to stop the questioning at any point. Following this clarification, the appellant stated he did not want a lawyer at that time and was willing to answer questions.

Prior to trial, trial defense counsel requested the Government produce A1C AK as a witness at the appellant's court-martial. Trial defense counsel proffered that A1C AK would testify about inconsistent statements made by A1C GG concerning the sexual assault and his opinion that A1C GG had a bad character for truthfulness. Trial defense counsel did not pursue a motion to compel production of A1C AK when the Government failed to produce him as a witness. Because of issues with A1C AK's travel arrangements, the defense would have had to request a delay of a day or two to have him produced as a witness.

During the preliminary Article 39a, UCMJ, 10 U.S.C. § 839a, session, the Government sought to add the terminal element to both Article 134, UCMJ, specifications (Specifications 1 and 2 of Additional Charge III).[2] Trial defense counsel believed the changes to be major changes, but did not object to the addition of the language to the two relevant specifications. The appellant was ultimately convicted of Specification 2 of Additional Charge III.

The appellant was initially charged with allegedly committing an indecent act with a third individual, Ms. JI. In an attempt to accommodate the personal schedule of Ms. JI, the Government arranged her travel so she would arrive at a time the Government believed they would be near the end of their case-in-chief. The court-martial started on 22 June 2011 and proceeded more quickly than the Government had anticipated. The Government's last witness finished testifying at approximately 0915 on 23 June 2011. Ms. JI was not scheduled to arrive in the local area until late in the evening on 23 June 2011. The Government asked for a continuance until the next day to await the

---

[2] The Government added the following language to both Specifications of Additional Charge III: "and that under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces."

arrival of Ms. JI, which trial defense counsel opposed. The military judge denied the continuance request and the Government was forced to rest their case-in-chief. Trial defense counsel immediately made a motion for a finding of not guilty pursuant to Rule for Courts-Martial (R.C.M.) 917 with respect to the specification related to Ms. JI. The military judge granted the defense motion.

*Wrongful Sexual Contact as an LIO of Abusive Sexual Contact*

The appellant was charged with two specifications of abusive sexual contact for fondling the breasts and touching the vulva of A1C GG by placing her in fear of reprisal by using his rank and military position. He was found not guilty of these Article 120, UCMJ, offenses but, with respect to both, was found guilty of the LIO of wrongful sexual contact, also under Article 120, UCMJ. The appellant asserts the military judge erred in concluding wrongful sexual contact is an LIO of abusive sexual contact.

"An accused may be found guilty of an offense necessarily included in the offense charged." Article 79, UCMJ, 10 U.S.C. § 879. Article 79, UCMJ, requires application of the elements test to determine whether one offense is an LIO of a charged offense. *United States v. Jones*, 68 M.J. 465, 472 (C.A.A.F. 2010). Under the elements test, "the elements of the lesser offense [must be] a subset of the elements of the charged offense. Where the lesser offense requires an element not required for the greater offense, no instruction [regarding a lesser included offense] is to be given." *United States v. Alston*, 69 M.J. 214, 216 (C.A.A.F. 2010) (alteration in original) (quoting *Schmuck v. United States*, 489 U.S. 705, 716 (1989)). "The due process principle of fair notice mandates that 'an accused has a right to know what offense and under what legal theory' he will be convicted; an LIO meets this notice requirement if 'it is a subset of the greater offense alleged.'" *Jones*, 68 M.J. at 468 (quoting *United States v. Medina*, 66 M.J. 21, 26-27 (C.A.A.F. 2008)).

However, "the elements test does not require that the two offenses at issue employ identical statutory language." *Alston*, 69 M.J. at 216. Instead, after applying the "normal principles of statutory construction," the question is whether the elements of the alleged LIO are a subset of the elements for the charged offense. *Id.* (quoting *Carter v. United States*, 530 U.S. 255, 263 (2000)).

Thus, the first step is to determine the elements of the charged offense and the alleged LIO by applying the principles of statutory construction. The second step is to compare the elements of the two offenses to see if the latter is a subset of the former.

The first specification at issue alleged, under Article 120, UCMJ, that the appellant touched the breasts of A1C GG by placing her in fear of reprisal. The second specification at issue alleged the appellant touched the vulva of A1C GG by placing her in fear of reprisal. The elements of abusive sexual contact by placing in fear are:

(1) That the accused engaged in sexual contact with another person; and

(2) That the accused did so by placing that other person in fear of reprisal.

The elements of wrongful sexual contact are:

(1) That the accused had sexual contact with another person;

(2) That the accused did so without that other person's permission; and

(3) That the accused had no legal justification or lawful authorization for that sexual contact.

Applying the elements test in this case, the first element of both offenses is the same. The question then turns to whether "without permission" is included within the second element of abusive sexual contact. As a preliminary matter, we note that Congress clearly intended "permission" to be synonymous with "consent," and thus we will treat the terms as such in our analysis. *See United States v. Thompson*, ACM 37443 (A.F. Ct. Crim. App. 6 May 2010) (unpub. op.).

Applying the common and ordinary understanding of these words, it would appear that an allegation that a victim is compelled to submit to sexual acts out of fear of reprisal includes as a subset that the victim is not consenting. A strong argument can be made that, if an individual only submits to an act out of fear, then it cannot be said that he consented or gave permission to the act in question. In fact, this logic would appear to apply to all three ways in which abusive sexual contact can occur: (1) by use of threat or placing in fear; (2) by causing bodily harm; or (3) upon a person who is substantially incapacitated or substantially incapable of appraising the act, declining participation, or communicating unwillingness.

Notwithstanding the "common sense" appeal of such an argument, it is undercut by the *Manual for Courts-Martial's* treatment of the issue of whether wrongful sexual contact is an LIO of abusive sexual contact. As noted above, the first element of these two offenses essentially mirror each other. If every case that satisfies the second element of abusive sexual contact *ipso facto* results in a conclusion of lack of permission or consent, then one would assume that in all cases wrongful sexual contact would be an LIO of abusive sexual contact. However, paragraph 45(d)(8) of the *Manual* (the "lesser included offenses" section) does not list wrongful sexual contact as an LIO of abusive sexual contact. *Manual for Courts-Martial, United States* (*MCM*), Part IV, ¶ 45.d.(8) (2008 ed.). Instead, paragraph 45(e), which is titled "additional lesser included offenses," states "[d]epending on the factual circumstances in [the] case," wrongful sexual contact "may" be considered an LIO of abusive sexual contact. *MCM*, ¶ 45.e.(8). This treatment of the LIO issue suggests that in some, but not all situations, depending on the facts, the second element of abusive sexual contact can be proven even in the absence of evidence that would satisfy the second element of wrongful sexual contact.

ACM 37981

Even more troubling for the "common sense" approach forwarded above is Congress' specific treatment of the issue within the statutory language of Article 120, UCMJ. We must consider what Congress has said on the matter because Congress has broad authority to define the elements of offenses under the constitutional power to make rules for the Government and regulation of the armed forces. U.S. CONST. art. I, § 8, cl. 14; *see Parker v. Levy*, 417 U.S. 733, 756 (1974); *see also Weiss v. United States*, 510 U.S. 163, 177 (1994). Furthermore, the Supreme Court has "observed that '[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute.'" *Dixon v. United States*, 548 U.S. 1, 7 (2006) (alteration in original) (quoting *Liparota v. United States*, 471 U.S. 419, 424 (1985)).

In analyzing the issue at hand, we must first give all terms used their plain and ordinary meaning. If an ambiguity exists, we must examine the legislative history to resolve the ambiguity. If, after applying the first two steps, doubt still exists as to the provision's intent, we must apply the rule of lenity and resolve the ambiguity in favor of the appellant. *See Moskal v. United States*, 498 U.S. 103 (1990); *see also United States v. Thomas*, 65 M.J. 132, 135 n.2 (C.A.A.F. 2007) (noting rule of statutory strict construction and resolving any ambiguity in favor of accused); *United States v. Hunter*, 65 M.J. 399, 401 (C.A.A.F. 2008) ("Ordinary rules of statutory construction apply in interpreting the R.C.M."); *United States v. Custis*, 65 M.J. 366, 370 (C.A.A.F. 2007) (recognizing that normal rules of statutory construction apply to the *Manual* in general and Military Rules of Evidence in particular); *United States v. Lewis*, 65 M.J. 85, 88 (C.A.A.F. 2007) (The courts "use well-established rules of statutory construction to construe the *Manual for Courts-Martial*."). If the statute's language is plain, then "[i]t is well established that . . . the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) (internal quotation marks omitted); *see also Lewis*, 65 M.J. at 88.

The 2007 amendment to Article 120, UCMJ, omitted "lack of consent" as an element of virtually all sexual misconduct offenses, except the offense of wrongful sexual contact. This change from the previous version of Article 120, UCMJ, brought the UCMJ sexual misconduct provisions into alignment with similar provisions applicable in the United States District Courts. *See* Analysis of Punitive Articles, *MCM*, A23-15. Specifically, Article 120(r), UCMJ, provides:

> Lack of permission is an element of the offense . . . [of wrongful sexual contact]. Consent and mistake of fact as to consent are not an issue, or an affirmative defense, in a prosecution under *any other subsection*, except they are an affirmative defense for the sexual conduct in issue in a prosecution . . . [for abusive sexual contact].

(emphasis added).

The limited legislative history suggests this revision was intended to focus the finder of fact on the accused's conduct, instead of the victim's conduct or state of mind.[3] The text of Article 120(r), UCMJ, reflects this change in focus very clearly.

We must assume Congress intended and understood the effect of omitting "lack of consent" as an element of the offense. *See United States v. Wilson*, 66 M.J. 39, 45-46 (C.A.A.F. 2008). According to the plain language of Congress, wrongful sexual contact *requires* proof of an element, i.e. without permission, that abusive sexual contact does not. This additional proof requirement mandates a conclusion that wrongful sexual contact cannot be considered an LIO of abusive sexual contact under the test articulated in *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Without permission or consent cannot be *necessarily* included in the elements of abusive sexual contact when Congress has unambiguously stated that consent is "not an issue" in abusive sexual contact cases, regardless of the common sense appeal of an argument to the contrary. While the scope of the meaning of "not an issue" can be open to some interpretation, even the narrowest reading of the language requires a conclusion that "without consent" or "permission" is not an element of abusive sexual contact.

In a prosecution for abusive sexual contact, the Government does not have to prove the absence of consent in order to secure a conviction. *See United States v. Neal*, 68 M.J. 289 (C.A.A.F. 2010). Under the structure of the version of Article 120, UCMJ, in effect at the time of the alleged offenses in this case, the absence of consent or permission was not a fact necessary to prove the offense of abusive sexual contact. Evidence that the alleged victim consented would be relevant to the factfinder's determination of whether the Government proved the element of "by fear" beyond a reasonable doubt, but it was not necessary under the law. Article 120(r), UCMJ, does not preclude introduction of evidence of consent as a "subsidiary fact" pertinent to the prosecution's burden to prove an element of abusive sexual contact beyond a reasonable doubt, but it also does not require the Government to introduce any evidence of lack of consent or permission to prove the elements of the offense beyond a reasonable doubt. *See Neal*, 68 M.J. at 302. In short, under the plain language articulated by Congress, the Government can prove each element of abusive sexual contact beyond a reasonable doubt without introducing any evidence related to lack of permission or consent.

In analyzing whether wrongful sexual contact is an LIO of any other offense in Article 120, UCMJ, our sister courts have reached conflicting decisions. *See United States v. Honeycutt*, Army 20080589, unpub. op. at 2 (Army Ct. Crim. App.

---

[3] *See* Analysis of Punitive Articles, *Manual for Courts-Martial, United States*, A23-15 (2008 ed.) (noting amendments based on 18 U.S.C. §§ 2241-45); 151 CONG. REC. H12210 (December 18, 2005) (statement of Rep. Loretta Sanchez); Markup of the Defense Authorization Bill: Hearing before the Military Personnel Subcommittee of the House Armed Services Committee (May 11, 2005) (statement of Rep. John McHugh).

1 September 2010) (finding wrongful sexual contact was not an LIO of rape by force because "[t]he elements of rape by force do not include any, let alone all, of the elements of wrongful sexual contact"); *United States v. Wagner*, Army 20111064, unpub. op. at 7 (Army Ct. Crim. App. 29 July 2013) (holding wrongful sexual contact is an LIO of the offense of aggravated sexual assault but not under the particular facts of that case); *United States v. Prothro*, Army 20110331, unpub. op. at 2 (Army Ct. Crim. App. 29 March 2013) ("In this case, wrongful sexual contact does not qualify as a lesser-included offense because that offense requires an element [without the other person's permission] not required for the greater offense of abusive sexual contact caused solely by fear."); *United States v. Johanson*, 71 M.J. 688, 693 (C.G. Ct. Crim. App. 2012) (concluding wrongful sexual contact is an LIO of abusive sexual contact of a person substantially incapable of declining participation because "[s]urely a lack of consent is inherent in substantial incapability of declining participation"); and *United States v. Medina*, 68 M.J. 587 (N.M. Ct. Crim. App. 2009) (Beal, J., dissenting in part and concurring in part) (observing that wrongful sexual contact was an LIO of aggravated sexual assault because "the Manual for Courts-Martial itself validates the notion that 'lack of consent' is an implicit element to aggravated sexual assault" in recognizing wrongful sexual contact as a potential lesser included offense in paragraph 45(e)(8)).

This Court has previously found wrongful sexual contact to be an LIO of a different Article 120, UCMJ, charge (aggravated sexual assault). *See United States v. Pitman*, ACM 37453, unpub. op. at 5 (A.F. Ct. Crim. App. 19 May 2011) ("[A]n allegation that a victim is compelled to submit to sexual acts by force clearly includes as a subset that the victim is not consenting."). The Court of Appeals for the Armed Forces has not squarely answered whether wrongful sexual contact can ever be an LIO of any other Article 120, UCMJ, charge. Based on our reading of the plain language of Congress that lack of consent or permission is not an element of any offense under Article 120, UCMJ, except wrongful sexual contact, we conclude today that wrongful sexual contact can never be an LIO of any other offense under Article 120, UCMJ.[4]

*Factual and Legal Sufficiency*

The appellant further argues the evidence was factually and legally insufficient to support his conviction of both specifications of wrongful sexual contact with A1C GG[5] as well as forcible sodomy of A1C KT and maltreatment of A1C KT. We review issues of

---

[4] Our holding applies, of course, to the law in effect at the time of the charged offenses. Since then, Article 120, UCMJ, 10 U.S.C. § 920, has been revised again. *See* Analysis of Punitive Articles, *Manual for Courts-Martial, United States*, A23-15 (2012 ed.) ("The 2012 amendments . . . simplified the structure of the definition and deleted restrictions regarding the use of consent evidence.").

[5] Because of our determination that wrongful sexual contact is not an LIO of abusive sexual contact, we do not need to consider the issue of whether the evidence was factually and legally sufficient to support the wrongful sexual contact convictions.

factual and legal sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987), *quoted in United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *Turner*, 25 M.J. at 324, *quoted in United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citing *United States v. Rogers*, 54 M.J. 244, 246 (C.A.A.F. 2006); *United States v. Blocker*, 32 M.J. 281, 284 (C.M.A. 1991)). Our assessment is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993).

I. Forcible Sodomy of A1C KT

Although she initially agreed to perform oral sex on the appellant in an attempt to get him to leave her alone, A1C KT almost immediately decided she did not want to continue. She manifested her desire to stop by attempting to pull her head away from the appellant's groin area. The appellant would not allow her to do so and forcibly held her head until he ejaculated. The evidence factually and legally supports a finding of guilty with respect to this offense.

The defense argues the evidence related to the wrongful sexual contact charges involving A1C GG essentially propped up the allegation of forcible sodomy with A1C KT and without that evidence the appellant would not have been convicted of forcible sodomy.

We disagree with the appellant's suggestion that a military judge would have difficulty evaluating the charges separately. A military judge is presumed to know and follow the law. *See United States v. Kinman*, 25 M.J. 99, 100-01 (C.M.A. 1987). Through training and experience, a military judge sitting as a factfinder is less susceptible to the dangers of "impermissible spillover" than an inexperienced lay court member. Also, the evidence supporting the forcible sodomy charge in this case was strong. We are

confident the military judge based his findings on that evidence and not general notions that the appellant was a bad actor, as demonstrated by other misdeeds. In fact, the military judge acquitted the appellant of abusive sexual contact. We are not persuaded that this is the rare case where the evidence and the nature of the charges have overcome the military judge's ability to avoid the prejudicial use of evidence. *Id.*

As he did at trial, the appellant argues the evidence is insufficient to find him guilty of forcible sodomy because it reveals A1C KT consented to the oral sex that occurred between on or about 1 September 2007 and on or about 30 November 2007. Having weighed the evidence in the record of trial, with allowances for not having personally observed the witnesses, including A1C KT, we are personally convinced of the appellant's guilt beyond a reasonable doubt. Similarly, we find a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.

## II. Maltreatment of A1C KT

The court-martial convicted the appellant of two specifications of maltreatment of a subordinate, in violation of Article 93, UCMJ. Both specifications involved A1C KT; one with an alleged situs of Beale AFB and the other with a situs of Iraq. The elements of maltreatment are: (1) that a certain person was subject to the orders of the accused; and (2) the accused was cruel toward, or oppressed, or maltreated that person. *MCM*, Part IV, ¶ 17.b. "The essence of the offense [of maltreatment] is abuse of authority." *United States v. Carson*, 57 M.J. 410, 415 (C.A.A.F. 2002). Measured from an objective viewpoint in light of the totality of the circumstances, the charged acts must be such that they "reasonably could have caused physical or mental harm or suffering" but the offense does not require proof of "actual physical and mental pain or suffering." *Id.* The appellant argues the evidence is insufficient to show an abuse of authority.

We find the evidence legally and factually sufficient to support the conviction of maltreatment. Under the totality of the circumstances in this case, the appellant abused his authority by making repeated comments about A1C KT's breasts, repeatedly asking to see her breasts, and touching her breasts without her permission while on patrol at Beale AFB, and by making comments about A1C KT's body, touching her body, and repeatedly requesting oral sex from A1C KT while deployed to Iraq. The appellant's actions reasonably could have caused mental harm or suffering in that A1C KT was clearly concerned by the appellant's actions. After weighing the evidence and making allowances for not having observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt. Likewise, we find a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.

*Exclusion of Mil. R. Evid. 412 Evidence*

We review the military judge's ruling on whether to exclude evidence pursuant to Mil. R. Evid. 412 for an abuse of discretion. *United States v. Roberts*, 69 M.J. 23, 26 (C.A.A.F. 2010). Findings of fact are reviewed under a clearly erroneous standard and conclusions of law are reviewed de novo. *Id.*

Mil. R. Evid. 412 states that evidence offered by the accused to prove the alleged victim's sexual predispositions, or that she engaged in other sexual behavior, is inadmissible except in limited contexts. Mil. R. Evid. 412(a)-(b). The rule "is intended to 'shield victims of sexual assaults from the often embarrassing and degrading cross-examination and evidence presentations common to [sexual offense prosecutions].'" *United States v. Gaddis*, 70 M.J. 248, 252 (C.A.A.F. 2011) (alteration in original) (quoting Analysis of the Military Rules of Evidence, *MCM*, A22-35). While there are three exceptions set out in the rule, we are concerned only with the third, which states that the evidence is admissible if "the exclusion of [it] would violate the constitutional rights of the accused." Mil. R. Evid. 412(b)(1)(C).

The exception for constitutionally required evidence in Mil. R. Evid. 412(b)(1)(C) includes the accused's Sixth Amendment[6] right to confrontation. *United States v. Banker*, 60 M.J. 216, 221 (C.A.A.F. 2004) (citing *Weinstein's Federal Evidence* § 412.03 [4][a] (2d ed. 2003)), *abrogated by Gaddis*, 70 M.J. 248. An accused has a constitutional right "to be confronted by the witnesses against him." U.S. CONST. amend. VI. That right necessarily includes the right to cross-examine those witnesses. *Davis v. Alaska*, 415 U.S. 308, 315 (1974) (citing *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)). In particular, the right to cross-examination has traditionally included the right "to impeach, *i.e.,* discredit, the witness." *Davis*, 415 U.S. at 316, *quoted in Olden v. Kentucky*, 488 U.S. 227, 231 (1988).

However, an accused is not simply allowed "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985), *quoted in Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Indeed, "'trial judges retain wide latitude' to limit reasonably a criminal defendant's right to cross-examine a witness 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Michigan v. Lucas*, 500 U.S. 145, 149 (1991) (quoting *Van Arsdall*, 475 U.S. at 679). But no evidentiary rule can deny an accused a fair trial or all opportunities for effective cross-examination. *See Van Arsdall*, 475 U.S. at 679.

Generally, evidence must be admitted within the ambit of Mil. R. Evid. 412(b)(1)(C) when the evidence is relevant and material, and the probative value of the evidence outweighs the dangers of unfair prejudice. *See Gaddis*, 70 M.J. at 255 ("[T]he best reading of the rule is that . . . the probative value of the

---

[6] U.S. CONST. amend. VI.

evidence must be balanced against and outweigh the ordinary countervailing interests reviewed in making a determination as to whether evidence is constitutionally required."). Relevant evidence is any evidence that has "any tendency to make the existence of any fact . . . more probable or less probable than it would be without the evidence." Mil. R. Evid. 401. The evidence must also be material, which is a multi-factored test looking at "the importance of the issue for which the evidence was offered in relation to the other issues in th[e] case; the extent to which this issue is in dispute; and the nature of other evidence in the case pertaining to this issue." *United States v. Colon-Angueira*, 16 M.J. 20, 26 (C.M.A. 1983) (quoting *United States v. Dorsey*, 16 M.J. 1, 6 (C.M.A. 1983)). Finally, if evidence is material and relevant, then it must be admitted when the accused can show its probative value outweighs the dangers of any potential unfair prejudice. *See* Mil. R. Evid. 412(c)(3). Those dangers include concerns about "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679.

In this case, the defense failed to articulate any reasonable theory tending to show that A1C GG had a motive to fabricate about whether the sexual conduct with the appellant was consensual. It is undisputed that at some point A1C GG had a relationship with SrA BM while he was married to another woman. However, the appellant's assertion that that "a sexual relationship between A1C GG and SrA BM existed before she reported to SrA BM" that she had been sexually assaulted is not supported by the evidence. The earliest possible start date of a sexual relationship supported by the evidence was 29 August 2010,[7] two days after A1C GG told SrA BM the appellant sexually assaulted her. Even taking the facts as argued by the defense, the earliest date such a relationship began was two days after A1C GG told SrA BM about the appellant's conduct. The appellant's argument is that because A1C GG had sex with another person, she had a motive to lie about what occurred with the appellant. If we accepted this rationale, then any sexual intercourse engaged in by an alleged victim either before or after an alleged sexual assault would be admissible. Such an approach would make Mil. R. Evid. 412 a nullity. There must be some other rational connection between the other sexual activity and a motivation to fabricate a sexual assault. The military judge correctly noted the appellant failed to provide any theory showing the questioned evidence was relevant or how the evidence supported any defense theory. This situation is clearly distinguishable from cases where an extramarital affair was deemed admissible when the defense articulated a plausible theory that the alleged victim fabricated a sexual assault allegation to prevent the disintegration of his or her marriage. Personal experience, general knowledge, and an understanding of human conduct and motivation fail to support how the proffered evidence in this case sufficiently supports the appellant's theory.

---

[7] Senior Airman BM's nonjudicial punishment action for the relationship alleged that it started "on or about 29 August 2009." The appellant's reliance on the "on or about 29 August 2010" language as proof that the relationship began before Airman First Class GG disclosed the appellant's conduct incorrectly assumes the relationship had to have begun on the earliest date within the charged timeframe.

Evidence of A1C GG's relationship with SrA BM has no direct and substantial link to her credibility. Under the given facts, the existence of the relationship, especially given its timing, did not establish a greater motive for A1C GG to lie about whether her sexual encounter with the appellant was consensual. Because the evidence has no tendency to make a fact that is of consequence to the determination of the case more or less probable than it would be without the evidence, it is neither relevant nor material.

In this case, we conclude the military judge did not abuse his discretion when he excluded this evidence. The record reveals nothing more than speculative assertions and conjecture in this regard, and we conclude the appellant failed to meet his burden in demonstrating relevance. Mil. R. Evid. 412(c)(3); *see also Roberts*, 69 M.J. at 27-28.

*Assistance of Counsel*

The appellant argues his trial defense counsel's performance amounted to ineffective assistance. Specifically, the appellant claims his counsel were ineffective for failing to: (1) Object to a major change to the charge sheet (the addition of the terminal elements on Specification 2 of Additional Charge III); (2) File a motion to compel the appearance of a favorable witness after "9 RW/JA failed to have him produced in order to testify live"; (3) Seek the suppression of the appellant's videotaped statements to AFOSI after the appellant told AFOSI he wanted legal counsel and did not want to answer questions; and (4) Request and present evidence at the Mil. R. Evid. 412 hearing that established A1C GG's adulterous relationship with SrA BM began on 29 August 2010. After reviewing the record of trial, we find no merit to this argument.

We review claims of ineffective assistance of counsel de novo, applying the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007). Under *Strickland*, an appellant must demonstrate: (1) a deficiency in counsel's performance that is so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment; and (2) that the deficient performance prejudiced the defense through errors so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Tippit*, 65 M.J. at 76 (quoting *United States v. Moulton*, 47 M.J. 227, 229 (C.A.A.F. 1997)) (internal quotation marks omitted). The deficiency prong requires that an appellant show the performance of counsel fell below an objective standard of reasonableness, according to the prevailing standards of the profession. *Strickland*, 466 U.S. at 688. The prejudice prong requires a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. Evidentiary hearings are required if there is any dispute regarding material facts in competing declarations submitted on appeal which cannot be resolved by the record of trial and appellate filings. *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997).

Applying these standards, we find that any material conflict in the respective declarations regarding this issue may be resolved by reference to the record and appellate filings without the need for an evidentiary hearing. The comprehensive declarations by trial defense counsel address the alleged deficiencies and provide sound reasons for the decisions now questioned by the appellant.

The trial defense counsel strategy was to keep the case moving in hopes the Government would be unable to secure the presence of a third alleged victim. This strategy proved successful when the military judge refused a Government request for a one-day continuance to allow for the arrival of Ms. JI and granted the subsequent defense R.C.M. 917 motion. Objecting to the major change proposed by the Government would not have prevented this case from going to trial; it merely would have delayed the case and increased the likelihood that Ms. JI's presence at trial would be secured. Likewise, a successful motion to compel production of A1C AK would have delayed the trial and increased the likelihood Ms. JI testified. Trial defense counsel did a cost-benefit analysis and made a rational decision to forgo the testimony of A1C AK in favor of avoiding the possibility of having to defend against allegations levied by a third alleged victim who, unlike the first two victims, had not discussed her situation with any other alleged victim in the case. Trial defense counsel had a legitimate desire to avoid having the testimony of Ms. JI presented at the appellant's court-martial.

The evidence from A1C AK, on the other hand, was mixed for the defense. Based on the proffered evidence, he would have offered an opinion that A1C GG had a bad character for truthfulness, but this was clearly offset by the fact that he was the jilted ex-fiancé of A1C GG. It was proffered that A1C AK would have testified that, in his Skype conversation/chat with A1C GG, she provided a description of the events that was inconsistent with her testimony at trial. However, the actual transcripts of the chats he had with A1C GG about the incident were consistent in some significant aspects with her testimony, and their admission through his testimony would have bolstered the testimony of A1C GG. Based on the clearly mixed value of his testimony, the defense made a strategically sound decision not to file a motion to compel production of A1C AK and delay the trial in order to prevent Ms. JI from arriving before the Government was forced to rest their case-in-chief. Trial defense counsels' affidavit provides information about the strategic and tactical decisions the defense made regarding these issues. These decisions were not unreasonable. The fact this plan did not result in a complete acquittal does not invalidate the defense strategy, and we give great deference to trial defense counsels' judgments in this area. *United States v. Morgan*, 37 M.J. 407, 409 (C.M.A. 1993); *United States v. Mazza*, 67 M.J. 470, 474-75 (C.A.A.F. 2009).

The appellant also complains about his trial defense counsels' decision to refrain from challenging the admissibility of his statements to AFOSI. Trial defense counsels' affidavit also provides information about the strategic and tactical decisions the defense made regarding this issue. Trial defense counsel knew in advance of trial they would

want to call the appellant as a witness. Once they called the appellant to the stand, many of the statements he made to AFOSI would have been admissible on cross-examination even if they had been suppressed initially by the military judge. Furthermore, and more importantly, the appellant's summary of the actual conversation with the AFOSI about whether he wanted a lawyer misstates what was actually said during the conversation. A review of the facts and the applicable law in this area make it abundantly obvious that any such motion to suppress would have failed. Trial defense counsel recognized the motion would not prevail and they certainly were not ineffective in failing to raise a motion that would have been denied.

Lastly, trial defense counsel were not ineffective for failing to request and present evidence that the sexual relationship between A1C GG and SrA BM began on 29 August 2010. Assuming the appellant could have established the sexual relationship in question began on 29 August 2010, such evidence, as noted above, was not relevant and would not have been admissible during the trial on the merits. As such, the appellant suffered no prejudice.

*Sentence Reassessment*

Having set aside the appellant's conviction of an offense, we must consider whether we can reassess the sentence or whether we must return the case for a rehearing on sentence. To validly reassess a sentence to purge the effect of error, we must be able to (1) discern the extent of the error's effect on the sentence and (2) conclude with confidence that, absent the error, the panel would have imposed a sentence of at least of a certain magnitude. *United States v. Buber*, 62 M.J. 476, 479 (C.A.A.F. 2006) (citing *United States v. Hawes*, 51 M.J. 258, 260 (C.A.A.F. 1999); *United States v. Doss*, 57 M.J. 182, 185 (C.A.A.F. 2002); *United States v. Taylor*, 51 M.J. 390, 391 (C.A.A.F. 1999)). We must also determine the sentence we propose to affirm is "appropriate," as required by Article 66(c), UCMJ, 10 U.S.C. § 866(c). "In short, a reassessed sentence must be purged of prejudicial error and also must be 'appropriate' for the offense involved." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). *See also United States v. Winckelmann*, 73 M.J. 11, 14-15 (C.A.A.F. 2013).

In this case, our action does not reduce the maximum permissible sentence the appellant faced because, based on the conviction for forcible sodomy alone, the appellant faced confinement for life. All other aspects of the maximum permissible sentence remain the same.

On the basis of the error noted, considering the evidence of record, and applying the principles set forth above, we determine that we can discern the effect of the errors and will reassess the sentence. Under the circumstances of this case, we are confident the military judge would have imposed the same sentence even if the appellant was not convicted of the wrongful sexual contact offenses. We also find, after considering the

appellant's character, the nature and seriousness of the offenses, and the entire record, that this reassessed sentence is appropriate.

*Conclusion*

The findings of guilty to Specification 1 of Charge II and the Specification of Additional Charge II are set aside and dismissed. The remaining findings and the sentence, as reassessed, are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).[8,9] Accordingly, the findings as modified, and the sentence as reassessed, are

AFFIRMED.

ROAN, Chief Judge (concurring in part and dissenting in part):

The appellant was charged with abusive sexual contact by placing A1C GG in fear of reprisal. Under these circumstances, I believe the issue of lack of consent is fairly encompassed within the charged specification and therefore, wrongful sexual contact, with its discrete elements of lack of permission and wrongfulness, is a lesser included offense (LIO). As a result, I dissent from my colleagues' rationale with respect to this issue and would affirm the findings of guilty to Specification 1 of Charge II and the Specification of Additional Charge II. I concur in the remainder of the majority's opinion.

An accused may be found guilty of an offense charged as well as "an offense necessarily included in the offense charged." Article 79, UCMJ, 10 U.S.C. § 879. "Whether an offense is a lesser included offense is a question of law we review *de novo*." *United States v. Wilkins*, 71 M.J. 410, 412 (C.A.A.F. 2012) (quoting *United States v. Arriaga*, 70 M.J. 51, 54 (C.A.A.F. 2011)). When considering this question, our superior court has looked to the Supreme Court for guidance and adopted an "elements" test to determine whether one offense is a lesser included offense of another. *United States v. Alston*, 69 M.J. 214 (C.A.A.F. 2010). "[O]ne offense is not 'necessarily included' in another unless the elements of the lesser offense are a subset of the elements of the charged offense. Where the lesser offense requires an element not required for the

---

[8] Though not raised as an issue on appeal, we note that the overall delay of more than 540 days between the time of docketing and review by this Court is facially unreasonable. *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Having considered the totality of the circumstances and the entire record, we find the appellate delay in this case was harmless beyond a reasonable doubt. *Id.* at 135-36 (reviewing claims of post-trial and appellate delay using the four-factor analysis found in *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). *See also United States v. Harvey*, 64 M.J. 13, 24 (C.A.A.F. 2006); *United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002).

[9] The court-martial order (CMO) incorrectly states the appellant pled guilty to Charge III but not guilty to its Specification, when the appellant pled not guilty to all charges and specifications. Accordingly, we order promulgation of a corrected CMO.

greater offense, no instruction regarding a lesser included offense is to be given." *Id.* at 216 (quoting *Schmuck v. United States*, 489 U.S. 705, 716 (1989)) (internal alteration and quotation marks omitted).  Stated another way, "'[T]o be necessarily included in the greater offense the lesser must be such that it is impossible to commit the greater offense without first having committed the lesser.'"  *Schmuck*, 489 U.S. at 719 (quoting *Giles v. United States*, 144 F.2d 860, 861 (9th Cir. 1944)).

Accordingly, an accused may be convicted of an LIO only "in those cases where the indictment contains the elements of both offenses, and as a result gives notice to the defendant that he may be convicted on either charge."  *Alston*, 69 M.J. at 216 (quoting *Schmuck*, 489 U.S. at 718) (quotation marks omitted).  The charged and lesser offenses do not need to "employ identical statutory language"; rather, "the meaning of the offenses is ascertained by applying the 'normal principles of statutory construction.'"  *Id.* (citing *Carter v. United States*, 530 U.S. 255, 263 (2000)).  *See also United States v. Bonner*, 70 M.J. 1, 2 (C.A.A.F. 2011) (holding assault consummated by a battery is an LIO of wrongful sexual contact).

The appellant was charged with abusive sexual contact in violation of Article 120(h), UCMJ.  The elements of that offense, as applied to this case, are:

(1) That the accused engaged in sexual contact with another person; and
(2) That the accused did so by placing that other person in fear of reprisal.

*Manual for Courts-Martial, United States* (*MCM*), Part IV, ¶ 45.b.(8) (2008 ed.).

The elements of wrongful sexual contact, in violation of Article 120(m), UCMJ, are:

(1) That the accused had sexual contact with another person;
(2) That the accused did so without that other person's permission; and
(3) That the accused had no legal justification or lawful authorization for that sexual contact.

*MCM*, Part IV, ¶ 45.b.(13).

The first element of "sexual contact" is the same in both offenses.  Therefore, the question is whether the element of engaging in sexual contact "by placing that other person in fear of reprisal" necessarily means committing the act "without that . . . person's permission" and without "legal justification or lawful authorization."  I believe it does.

When evaluating whether one offense is included within another, we do not conduct a word-for-word comparison of the elements, as the statutory language does not

have to be identical. *See Alston*, 69 M.J. at 216. Rather, we apply the normal principles of statutory construction to ascertain the meaning of the offenses. *Id.*

Turning to the second element of abusive sexual contact listed above, that element requires that the accused engaged in sexual contact "by placing that other person in fear." A victim who submits to sexual conduct out of fear has not, by definition, consented to it. As provided by Article 120(t)(14), UCMJ, "The term 'consent' means words or acts indicating a freely given agreement to the sexual conduct at issue by a competent person. . . . Lack of verbal or physical resistance or submission resulting from the accused's . . . placing another person in fear does not constitute consent." The second element of the charged offense (fear of reprisal), therefore, will always consist of a nonconsensual sexual contact because it is accomplished in a manner that per se excludes consent as a possibility. Accordingly, I would conclude the offense of wrongful sexual contact, which requires only the sexual contact be wrongful and "without that other person's permission," is entirely encompassed by the offense of abusive sexual contact when that contact occurs through fear of reprisal.[10]

I would follow this court's holding in *United States v. Pitman*, ACM 37453 (A.F. Ct. Crim. App. 19 May 2011) (unpub. op.), where we concluded wrongful sexual contact is an LIO of aggravated sexual contact. As we stated in *Pitman*, "[a]pplying the common and ordinary understanding of these words, an allegation that a victim is compelled to submit to sexual acts by force clearly includes as a subset that the victim is not consenting." *Pitman*, unpub. op. at 4. We also observed that "[t]he elements test . . . affirms this interpretation since it would be impossible to prove the force required for the greater offense . . . without also proving the wrongfulness and lack of permission required for the lesser offense." *Id.* The same analysis holds true here. It would be impossible to prove the offense of abusive sexual contact by fear of reprisal without also proving the wrongfulness and lack of permission for the lesser offense. The converse is also not necessarily true; a victim may not consent to sexual contact despite the absence of any imposition of fear.

The appellant relies heavily on his interpretation of *United States v. Jones*, 68 M.J. 465 (C.A.A.F. 2010), but that case it distinguishable. In *Jones*, our superior court ruled an indecent act under Article 134, UCMJ, is not an LIO of rape under Article 120, UCMJ, because the two offenses shared "no common ground" and there was

---

[10] An act of sexual conduct accomplished by imposing fear is akin to constructive force or parental compulsion, concepts that military courts previously recognized in the context of the offense of rape, prior to the 1 October 2007 amendment to Article 120, UCMJ, which contained both force and lack of consent as an element. *See, e.g.*, *United States v. Palmer*, 33 M.J. 7 (C.M.A. 1991) (upholding instructions in prosecution for rape that equated consent induced by fear, fright, or coercion to physical force); *United States v. Dejonge*, 16 M.J. 974 (A.F.C.M.R. 1983) (constructive force exists where sexual intercourse is accomplished under compulsion of parental command); *United States v. Edens*, 29 M.J. 755 (A.C.M.R. 1989) (child's acquiescence to sexual acts not consent, but submission to constructive force).

"nothing in that charge [that] put Appellant on notice that he also needed to defend against indecent acts." *Id.* at 473. The due process concerns discussed by the Court in *Jones* in relation to the identification of LIOs are not present in this case. The accused in *Jones* was charged with rape under Article 120, UCMJ, yet was convicted of the LIO of indecent acts under Article 134, UCMJ, with its unique terminal elements. *Id.* at 466-67. Unlike in *Jones*, the offenses of which this appellant was charged and convicted are part and parcel of the same Article 120, UCMJ, which criminalizes various degrees of sexual misconduct. Moreover, as discussed above, the elements of wrongful sexual contact are entirely encompassed by the elements of abusive sexual contact. The appellant's argument that wrongful sexual contact is not an LIO of abusive sexual contact relies on the inherently contradictory notion that it is possible to "give permission" to being compelled to submit to sexual contact out of fear.

The appellant also claims he "did not receive fair notice" that wrongful sexual contact is an LIO of abusive sexual contact. But notice was provided by a plain reading of the elements of both offenses, which reveals that abusive sexual contact by placing another in fear is necessarily wrongful and without the victim's consent. Moreover, although not dispositive of the issue, wrongful sexual contact is listed in the *Manual* as a possible LIO of abusive sexual contact. *MCM*, Part IV, ¶ 45.e.(8); *see generally United States v. Jones*, 68 M.J. 465 (C.A.A.F. 2010). Thus, the appellant was certainly on notice he had to defend himself against the Government's correct assertions his actions were done without legal justification and without his victim's permission.

Finally, the record reveals trial defense counsel was aware of this fact and defended against the lesser as well as the greater offense by arguing the sexual conduct was consensual. In opening statement, trial defense counsel began by telling the military judge that he would see "an NCO who engaged in some consensual conduct with Airmen from within the squadron." Trial defense counsel stated that while the appellant's actions might be "distasteful" because he was married, "that is not what [the appellant] is charged with here. . . . He is charged with a variety of non-consensual acts." Referring specifically to the victim of the abusive sexual contact specifications, Airman First Class (A1C) GG, trial defense counsel stated, "[the appellant] gave [A1C GG] the opportunity to back out of this consensual relationship and she chose not to."

Finding no error, I would approve the findings and sentence.


FOR THE COURT

STEVEN LUCAS
Clerk of the Court